UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

UNITED STATES OF AMERICA,


      - against -                                        21 Cr. 277 (PAE)


JAMES BRADLEY,

           *Defendant.*

-----------------------------------------------------------------x



**SENTENCING MEMORANDUM FOR JAMES BRADLEY**



Richard J. Ma, Esq.
20 Vesey Street, Suite 400
New York, New York 10007
Tel: (212) 431-6938
richardma@maparklaw.com

Anthony Cecutti, Esq.
217 Broadway, Suite 707
New York, New York 10007
Tel: (212) 619-3730
anthonycecutti@gmail.com

Kestine M. Thiele, Esq.
217 Broadway, Suite 707
New York, New York 10007
Tel: (212) 542-3460
kestine@kthielelaw.com

*Counsel to James Bradley*

*"Somewhere in there [is] the kid we knew."*[1]   James Vincent Bradley, at only 21 years old, has been on nearly a decade-long search for answers—about who he is, what he believes, and where he belongs.  James's story is not an unfamiliar one.  Most of us embark on this journey of self-actualization at some point or another.  Sadly, James's pursuit resulted in the case before us. This sentencing memorandum is submitted in support of James to assist the Court in its determination of an appropriate and reasonable sentence pursuant to Title 18 U.S.C. § 3553. He is scheduled to be sentenced on February 2, 2023.

Every sentencing presents the Court with a unique set of individual circumstances which must be carefully and thoughtfully considered.  A vital goal of the criminal justice system is to balance the value of deterrence and punishment against its destructive effects, while accounting for the capacity for positive change and rehabilitation.  James's circumstances and vulnerabilities made him an ideal candidate for radicalization, so desperate was his search for meaning and identity that the fantasy offered to him by Islamic extremist propaganda was too appealing to forgo. The charges here are of a serious nature.  Not long ago, James dreamt of pledging allegiance to Abu Ibrahim al-Hashimi al-Qurashi, ISIS's current leader.  But today, he has very different dreams.  They are dreams reminiscent of those he had only a few years ago as an Eagle Scout, LaGuardia High School student, and young New Yorker summering upstate with his parents.  After months of guided introspection, counseling with internationally-recognized deradicalization experts, and ongoing effort to repair his interpersonal relationships, James has denounced his extremist ideology.  We believe that he is the only federal criminal defendant to have *ever* undergone deradicalization counseling and fully deradicalized during the pendency of a case.  And he has done it, despite the limits and traumas of incarceration.  James has regained his sight, making truly remarkable strides towards becoming the healthy, contributing member of society he was always meant to become.

To move forward, James recognizes he needs continued direction and support to mature, overcome the psychological and physical traumas of confinement, and find his place in the world. Fortunately, he is now poised to do so.  More incarceration will do nothing but further hinder the development of his young mind and expose him to more crime, violence, abuse, and radicalized individuals.

After nearly two years of incarceration during a global pandemic and during crucial years for brain development, James is still only 21 years old and at a crossroads in his young life.  With the spotlight often limited to the crime of conviction, the extent of pathology and length of incarceration often predominate an individual's sentencing.  However, we urge a different approach. Rather than toil with questions like, "What is wrong with the defendant?" or "What length of incarceration is needed for the defendant?", we believe that the questions that ought to be pursued, reckoned with, and used to guide the Court in deciding the appropriate sentence for James should be:

- *What happened to James Bradley that resulted in his radicalization?*

- *What will it take, through rehabilitation efforts, to redeem and restore James Bradley to his family and community?*

---

[1] Letter from Cindy Kue at Exhibit B at 10.

It is our hope that this memorandum, along with a thoughtful and sincere letter written by James,[2] letters of support from family and loved ones,[3] a psychological evaluation conducted by Dr. Adeyinka Akinsulure-Smith,[4] and a report by deradicalization counselors from Parents For Peace ("PFP"),[5] provides a more complete picture of James and the context in which he engaged in criminal activity.  We respectfully request that the Court look with particular emphasis at James's personal history and background and his rehabilitation while incarcerated.  For all the reasons set forth herein, we submit that a sentence of time-served, with three years of mandated group and individual therapy, three years of continued deradicalization counseling and family counseling with PFP, in addition to educational or vocational requirements, is the appropriate sentence.  We believe that such a sentence is "sufficient, but not greater than necessary" for a young man who has endured two years' incarceration and engaged in a remarkable turnaround, while also fully considering the factors and purposes of sentencing delineated in 18 U.S.C. § 3553(a).

## I.      Background

On September 9, 2022, James Bradley pleaded guilty to Count One of the Indictment, attempting to provide material support or resources to a designated foreign terrorist organization, in violation of 18 U.S.C. §§ 2339B and 2, pursuant to a plea agreement.  The plea agreement contained the following advisory Guidelines calculations: (i) a base offense level of 26, pursuant to U.S.S.G. § 2M5.3(a); (ii) a 2-level increase because the offense involved the provision of material support or resources with the intent, knowledge or reason to believe that the material support or resources were to be used to commit or assist in the commission of a violent act, pursuant to U.S.S.G. § 2M5.3(b)(1)(E); (iii) a 12-level increase because a felony that involved, or intended to promote a federal crime of terrorism, pursuant to U.S.S.G. § 3A1.4(a); (iv) a 3-level reduction for timely acceptance of responsibility; (v) Criminal History Category VI, pursuant to U.S.S.G. § 3A1.4(b); and (vi) at adjusted offense level 37, in Criminal History Category VI, an advisory Guidelines sentencing range of 240 months of incarceration.

Although the plea agreement precludes the parties from advocating for any departures, the parties reserved the right to seek a non-Guidelines sentence pursuant to the application of the factors enumerated in Title 18 U.S.C. § 3553(a).

The Department of Probation ("Probation") provided the parties its final presentence report ("PSR"), dated December 2, 2022. In the PSR, Probation agreed with the advisory Guidelines calculation in the plea agreement.  Probation acknowledged Mr. Bradley's personal history and characteristics, as well as his deradicalization, and recommended a sentence of 72 months' incarceration, well below the advisory Guidelines range.

## II.     James's Personal History and Characteristics

---

[2] *See* Exhibit A.
[3] *See* Exhibit B.
[4] *See* Exhibit C.
[5] *See* Exhibit D.

James Bradley is a New Yorker.  He grew up in Washington Heights and moved to High-bridge in the South Bronx when he was 7.  He spent summers with his loving and present parents, Greg and Sandra Bradley, in the Catskills and enjoyed quality time with extended family on both sides throughout his young life.  He was "a very, very affectionate, loving child with a really, really sunny disposition."  Exhibit C at 3.  He brought his smile and cheerful attitude everywhere he went.

A gifted child, James picked up new activities, subjects, and skills quickly and with enthu-siasm.  He excelled academically, first at St. Joseph's School-Yorkville on the Upper East Side, then at Pierre Van Cortlandt Middle School in Croton-on-Hudson.  On weekends and after school, he spent hours engaged in extracurricular activities.  He started studying martial arts in the 4th grade, earned his junior black belt at 12, and first degree black belt at 17.  In the 3rd grade, James began playing the trumpet and his musical talent got him accepted into the prestigious LaGuardia High School.  He joined the Boy Scouts at 11 and earned merit badges for camping, hiking, ar-chery, and swimming.  Like his grandfather, James became an Eagle Scout, an accomplishment over which he still takes great pride, as only 1% of all scouts ever attain that rank.  During summer months, James worked as a freelance contractor, building, painting, and doing other odd jobs.  In his free time, he frequently sought out books about Spartans, knights, and samurais.  He was drawn to tradition and stories of chivalry, discipline, and honor.

Though James had devoted, supportive parents and the financial resources to learn and grow in school and pursue his passions, there were aspects of his childhood with which he strug-gled.  Living in the South Bronx, James was exposed to and a victim of criminal activity.  He recalls a neighbor being murdered 50 feet away from their home and a "half-a-million dollar crack raid" occurring in a nearby apartment building.  Exhibit C at 3.  He had interactions with older men with guns, and he witnessed drug deals.  Perhaps the most impactful experience was when someone flashed a gun in their waistband and robbed James of his prized designer belt, a 15th birthday gift from his parents.  Letter from Ethan Kue at Exhibit B at 8.

Growing up in these primarily Black and Brown neighborhoods, James also struggled with his identity.  The racial, ethnic, and cultural differences between James's family and most of the families around him were stark.  He did not quite feel at home anywhere, as he was "the only white boy for miles."  Exhibit C at 8.  Although his parents created many opportunities for him to interact with peers and find friendships in his early years, James never developed or maintained a signifi-cant friendship network.  *Id.*  The one significant friendship he had in elementary school ended poorly, leaving James feeling outcast, with no birthday party or sleepover invitations.  *Id.*  His parents hoped that James would find a best friend in high school, but it never happened.  *Id.* at 9.  All he had left was his moniker, "white boy," leading James to emphasize and identify with his mother's Panamanian heritage in an effort to fit in.  At times, he wore a headband bearing the Panamanian flag, and he struck up conversations just so he could share facts and traditions from the country.  *See e.g.*, Exhibit B at 9, 35, 51; *see also* Exhibit C at 8.

Compounding James's nascent identity crisis was a series of awkward interactions with girls he knew.  James had hoped to have his first romantic encounter in middle school but was disappointed when "a bunch of girls" rejected him when he asked them to a school dance.  Exhibit

C at 7.  The identity confusion is evident in the way James perceived himself.  He simultaneously describes his younger self as "small and thin," and wanting to be strong and attractive to the girls at school, yet somehow also tough in the streets, even "gang affiliated," and a ladies' man in high school.  *See* Exhibit C at 4.  The latter characterizations stand in contrast to those of his parents and others close to him.

James was raised Roman Catholic, but he was always curious about religion and spirituality.  Growing up, he attended church every Sunday with his parents, attended Catholic school from pre-kindergarten until fifth grade.  *Id.*  He was also an altar server.  *Id.*  As a young teenager, James often went to St. Patrick's Cathedral alone after school to pray.  Over time, though, his curiosity with spirituality became a deep fascination with world religions.  He studied Eastern religions, at one point acquiring a membership at the Rubin Museum of Art, and had passing interests in Judaism and Santeria.  *Id.*  All along, James was searching for an intentional, personal relationship with God to make sense of the world around him.  *Id.*  Though he hoped for guidance through bible study, he noted "huge contradictions" in Catholicism and felt deceived.  *Id.* at 5.  This revelation led to his all-consuming internal conflict and quest for guidance—for meaning and truth.

Around November 2017, when James was 16, he came across a YouTube lecture about Muslim prophets that sparked his interest in Islam.  At the various mosques he visited, James was welcomed with open arms and love.  He finally found the social circle, structure, and purpose that he had been longing for.  Two weeks before Ramadan in 2018, during James's junior year of high school, he fully embraced Islam and converted.  *Id.*  As with everything in James's life, he plunged headfirst into his new religion with intensity, fully investing himself.  He changed his eating habits, dress, and other customary practices.  *Id.* at 5.  He adopted the name "Abdullah."  He waded into religious debates and visited many religious websites and online forums.  *Id.*  James reveled in his new religion and identity, becoming increasingly critical of his parents and more dogmatic in his practice.  *Id.*  He prefaced most statements to his parents with: "My religion says… ."  *Id.*  His parents grew confused and concerned, as James was rigid, berating them for their lifestyle and choices.  *Id.*  James started wearing a thawb, traditional Muslim garb for men, to school, and he refused to participate in aspects of his education — even the trumpet — citing their prohibition in his religion.  *Id.*  By this time, James was ripe for radicalization; having found his community, he would soon fully embrace the community's grievances.

### III.    James's Radicalization and Resulting Offense Conduct

Around April 2018, towards the end of James's senior year of high school, James began attending the 96th Street Mosque on the Upper East Side.  There, less than six months after his conversion to Islam, James met related defendant Mohammed Delowar Hossain, an older Muslim man who eventually groomed and radicalized James.  Thirsty for companionship, James eagerly befriended Hossain.  They frequently met, speaking and learning about Islam, and together joined the Islamic Thinkers Society, a conservative Islamist group based in New York City that seeks the restoration of the Islamic caliphate.  After only a few months, Hossain introduced James to jihad and Anwar al-Awlaki, then the leader of al Qaeda.  At this point, James was in the early stages of radicalization.  He was empowered and influenced by Hossain, and his community of like-minded Muslims was growing larger.

5

In early fall 2018, Hossain introduced James to Abu Bakr and Sahil, who were two confidential informants part of an ongoing investigation into Hossain.  They too encouraged James to engage in extremism.  They all believed James to be a young zealot dedicated to their extremist faith and "cause."  In early 2019, Hossain, the leader of the group, hatched a plan to travel to Afghanistan, through Thailand, to join the Taliban.  PSR ¶ 17.  James, who was not even 18 years old at the time, planned to join them.  Hossain instructed the men to save money for weapons abroad, buy walkie-talkies, and gather supplies to camp in the mountains of Afghanistan.  *See United States v. Hossain*, 16 Cr. 606 (SHS), Trial Transcript at 263-67.  To avoid law enforcement detection, Hossain suggested the group undergo operative-type efforts to appear as kafir, non-believers.  *See id.* at 275-76.  He suggested they download pornography to their phones, drink alcohol, and go to strip clubs and pay with credit cards.  *Id.*  This is when James abandoned the group, stating extreme discomfort with those activities allegedly for religious reasons, though we believe that his young age was just as likely the cause for his discomfort.  On July 26, 2019, Hossain was arrested at John F. Kennedy International Airport attempting to board a plane to Thailand.  PSR ¶ 17.

Unfortunately, James was undeterred by Hossain's arrest due to the extremist ideology's continued grasp on him.  James's parents had hoped that sending him to college at SUNY Albany in the fall of 2019 would help tame his new religious principles, but he delved even deeper.  Now elevated by his sense of moral superiority, he was disgusted by the "immoral" acts of other students—drinking, sex, drugs.  James was again without community, roaming campus in the middle of the night to quiet his mind and curb his loneliness and depression.  He knew he would only find fulfillment in the pursuit of his faith, surrounded by other like-minded Muslims with the same priorities, the same values, and the same beliefs.  He consumed a steady diet of extremist, radicalizing propaganda: Muslim clerical lectures; chats between and content by other Islamic extremists online; and hours of slick, sophisticated ISIS videos.  Exhibit C at 5.  James dropped out of college after one semester and moved back into his parents' home, months before the start of the COVID-19 pandemic.  *Id.*  He used his computer at home to satisfy his hunger for extremist propaganda, and when his parents limited his computer use, James used his smartphone instead.  Then, the pandemic hit.  For more reasons than one, the pandemic opened up the opportunity for further radicalization.

"The pandemic … tapped into long-standing anxieties and let people band together in their search for answers, experts said, whether about the disease, or about immigration, or about globalism or socialism, or about any of the other bugaboos that have animated fringe movements in the past year."[6]  "Pandemics create insecurity, while extremism offers a kind of certainty…Especially now, when trust is low in government, in Congress, in science, in medicine, the church — there's nobody you can trust, so you trust your friends, your tribe." [7]  "Extremists offer a black-and-white view … There's a culprit responsible for some evil plan to destroy the nation, and they have a plan for restoration that will bring back greatness."[8]

---

[6] Marc Fisher. "Eroding trust, spreading fear: The historical ties between pandemics and extremism." THE WASHINGTON POST. Feb. 15, 2021. *Available at* https://www.washingtonpost.com/politics/pandemics-spawn-extremism/2021/02/14/d4f7195c-6b1f-11eb-ba56-d7e2c8defa31_story.html.

[7] *Id.*

[8] *Id.*

While the full impact of the pandemic on mental health, particularly for developing brains is not yet known, the emerging scientific study (which is consistent with the experiences that we all have had and observed) support that the increased social isolation, heightened concerns of safety and health, increased stress due to financial circumstances, increased family conflict, loss of social activities, poor adjustment to online schooling, increased screentime and sedentary behaviors, as well as additional race-based social-justice stressors attributable to the pandemic, had significant impacts on the mental health of many individuals, including James, only exacerbating his vulnerabilities for radicalization.[9]

At the beginning of the pandemic, James spent the majority of his time with Aref Uddin, another older Muslim man James met through Hossain in 2019, who worked as an undercover. In May 2020, James expressed his support for ISIS to Aref, who had quickly become James's most trusted friend and confidant. Like Abu Bakr and Suhail, Aref listened and praised him for his desire to join the fight. In recorded conversations, James shared his fantastical desire to travel to the Middle East or Africa to join ISIS, which he coined "Plan A," or if a terrorism watch list prevented him from leaving the country, attack U.S. military soldiers here, "Plan B." PSR ¶ 18. Frighteningly, James told Aref more than once that his "Plan B" would specifically be an attack on soldiers at the U.S. Military Academy in West Point, New York ("West Point"), where he had previously attended a regional Boy Scout event. *See id.* at 18. West Point was an academy and a future that James showed a great deal of past interest in. Growing up, he was attracted to the honor code, discipline, intensive combat training, camaraderie, and heroism of the U.S. military. But his radicalization now meant he aspired to obtain a bomb and contribute to the cause of "jihad" at West Point.

At this point desensitized to the violent content of ISIS propaganda, James continued to ingest and share horrifying materials online promoting Islamic extremism, even posting the ISIS flag on his social media accounts. *Id.* at ¶ 19. He shared videos of speeches by Abu Bakr al-Baghdadi, a now-deceased former leader of ISIS, and of ISIS-propagated incidents of violence with his new "brother," Aref. *Id.* Some of these videos included uniformed military soldiers being shot in the head, a prisoner in an orange jumpsuit digging his own grave before being executed, and a June 3, 2020 stabbing of an NYPD officer by a fellow Islamic extremist. *Id.*

In late 2020, James met co-defendant Arwa Muthana online. Weeks later, after minimal text conversations, James married Arwa in an Islamic marriage ceremony, during which Arwa was virtually present and an undercover served as a witness. *Id.* at ¶ 23. The two young radicals decided to travel to the Middle East to join their "brothers" and "sisters." *See id.* In March 2021, James, the 20-year-old, eager to consummate his marriage, rushed to Alabama to "rescue" his new wife, Arwa, from her childhood home. *Id.* Brimming with the excitement of beginning his first

---

[9] *See, e.g.,* Hasina Samji, Judy Wu, Amilya Ladak, Caralyn Vossen, Evelyn Stewart, Naomi Dove, David Long & Gaelen Snell, *Review: Mental Health Impacts of the COVID-19 Pandemic On Children and Youth — A Systematic Review,* CHILD AND ADOLESCENT MENTAL HEALTH, 27, No.2, 2022; *see also COVID-19 Pandemic Triggers 25% Increase In Prevalence of Anxiety and Depression Worldwide,* World Health Organization, www.who.int, March 2, 2022; Mariah T. Hawes, Aline K. Szenczy, Daniel N. Klein, Greg Hajcak, Brady D. Nelson, *Increases In Depression and Anxiety Symptoms In Adolescents and Young Adults During the COVID-19 Pandemic,* CAMBRIDGE UNIVERSITY PRESS, PSYCHOLOGICAL MEDICINE, 1-9, *available at* https://doi.org/10.1017/S0033291720005358.

romantic relationship, James got on a bus with Arwa back to New York City.  *Id.*  After about two weeks of holing up in a hotel and dreaming up their future life under ISIS rule on a compound with tens of kids, James paid an undercover to gain passage on a cargo ship for travel to Yemen.  *Id.*  On March 31, 2021, James and Arwa were arrested at a seaport in Newark, New Jersey trying to board a ship.  *Id.*

When James was still the victim of ISIS's propaganda machine, he fixated on the practice of what he considered to be the purest form of Islam—spreading the faith by sword, waging "holy war," and restoring the Islamic caliphate.  His corrupted view of Islam was exclusionary, oppressive, and appallingly violent.  This ideology was instilled in him by daily exposure for almost two and a half years to some of the most sophisticated propaganda in the world.  He associated the Islamic state with security for his community of Muslims.  He believed that it would be a safe and productive society for he and his wife to raise tens of kids.  James recalls repeatedly watching his favorite ISIS video, which depicted children smiling, laughing, and riding an amusement park Ferris wheel.  Unlike the South Bronx, he thought, the Islamic state offered a utopia, free from crime, persecution, and injustice.  He expected to be welcomed, free from the pain of not belonging, as long as he fulfilled his religious duty of fighting alongside his fellow mujahidin on the frontlines.  James was lost, and this system of beliefs and crystal-clear pathway to glory protected him from the discomfort and rejection of the real world.  It gave him community and significance.

"Although there were some signs (e.g., his ongoing spiritual quests, struggle to connect with his peers leading to exclusion), [James's] parents had little awareness of the inner turmoil he was experiencing.  To further aggravate the identity struggles characteristic of adolescence and young adulthood, other complicated factors (e.g., concern with moral issues, searching for a higher transcendent authority, stronger sense of moral duty than peers, a stronger orientation to action, adventure and risk) documented in the literature on radicalization seem to have played a role, setting James apart from youth who are merely confused and rebellious."  Exhibit C at 16-17.

## IV.    The Quest for Significance

Over the past several years, our nation has witnessed an explosion of American youth successfully radicalized by foreign terrorist organizations, causing them to abandon their traditional values to adopt violent ideology and engage in criminal behavior.[10]  Most scholars, terrorist experts, and federal investigative agencies agree that successful radicalization is based upon the foreign terrorist organization's identification and manipulation of a vulnerable, youthful mindset and profile.  At the time of his arrest, James had the prototypical personality that terrorism experts such as Arie Kruglanski have identified as subject to manipulation into violent thoughts or acts.[11]  Professor Kruglanski has observed:

---

[10] *See* Graeme Wood, "What ISIS Really Wants," THE ATLANTIC, March 2015, *available at* https://www.theatlantic.com/magazine/archive/2015/03/what-isis-really-wants/384980/.

[11] Arie W. Kruglanski is one of our nation's leading terrorism experts.  He is a Distinguished University Professor of Social Psychology at the University of Maryland; a recipient of numerous awards and is a Fellow of the American Psychological Association and the American Psychological Society.  Professor Kruglanski has served as editor of the Journal of Personality and Social Psychology: Attitudes and Social Cognition, editor of the Personality

These young people seem to have what psychologists call a very strong "need for cognitive closure," a disposition that leads to an overwhelming desire for certainty, order, and structure in one's life to relieve the sensation of gnawing—often existential—doubt and uncertainty…this need is something everyone can experience from time to time.[12]

Professor Kruglanski's "significance quest theory" suggests that radicalization involves the interplay of three determinants—the 3 Ns of violent extremism.[13] The first 'N' pertains to the individual's motivation—the *need* to feel that one is significant and that one matters.[14] The second 'N' pertains to the ideological *narrative* that enshrines violence as the means best suited for the attainment of significance.[15] Finally, the third 'N' pertains to the social *network*—the group or category of people whose acceptance and appreciation one seeks and whose validation of the ideological narrative is essential to its believability for the individual.[16] Extremism derives from a motivational imbalance in which a basic need is elevated disproportionately to other needs, which are then correspondingly inhibited.[17] This process expands the set of behavioral options for addressing the dominant need, including violent activities or adopting violent ideology generally prohibited by society norms.[18]

The quest for significance is the fundamental desire to matter, to be relevant, to have respect. Activation of the significance quest can happen through a loss of significance or humiliation of some sort, threatened significance loss, or an opportunity for significance gain.[19] For example, the Tsarnaev brothers, Dzohkar and Tamerlan, the perpetrators of the Boston Marathon bombing of April 2013, were poorly assimilated and felt marginalized with their parents on welfare nearing divorce, being unemployed, and in feud with successful family members who viewed them as "losers."[20] As a result, they may have entertained dreams of glory, whose realization appeared possible by becoming heroes according to the extremist ideology they adopted.[21] Experiences of significance loss often relate to one's social identity that is disparaged by others; that humiliation

---

and Social Psychology Bulletin, and associate editor of the American Psychologist. His work in the domains of human judgment and belief formation, the motivation-cognition interface, group and intergroup processes, and the psychology of human goals. Professor Kruglanski also conducts research with the support of grants from the Department for Homeland Security and from the Department of Defense on the psychological processes behind radicalization, de-radicalization, and terrorism.

[12] *See* Arie W. Kruglanski, "Here Are the Psychological Reasons Why an American Might Join ISIS," Mother Jones Magazine (Online Edition).

[13] *See* Arie W. Kruglanski, et al., *The Three Pillars of Radicalization: Needs, Narratives, and Networks*, Oxford University Press 2019 at 3-4.

[14] *Id.* at 4.

[15] *Id.*

[16] *Id.*

[17] *See id.* at 59.

[18] *See id.*

[19] *See id.* at 44.

[20] *See id.* at 44.

[21] *See id.* at 45.

and painful confusion is often skillfully exploited by terrorist propagandists like ISIS and its affiliates.[22] These moments arouse an individual's need for firm, unambiguous world views.  In particular, religious extremism is attractive because it provides a structure: clear delineation between good and evil and us-versus-them narratives.[23]  Pertinent in James's case is that even the *threat* or *idea* of significance loss can lead someone to pursue terrorism, which affords an individual an opportunity for untold meaning, a place in history, and the status of a martyr in one's community.[24]

Typically, a violence-justifying narrative like that of ISIS is designed to accomplish two functions: a) arousing the exposed individual's quest for significance by highlighting and dramatizing the humiliation one's group may have suffered, and b) forging the critical link between violence and significance, suggesting that engagement in the former will bring about the latter.[25] Violence is not an end, but rather a *means* to satisfying a basic human motivation for significance and meaning.  Terrorism researchers have long recognized the importance of social networks in promoting violent extremism.[26]  Individuals are typically exposed to violence-justifying ideological content through social contact with friends or relatives.  Individuals are generally motivated to agree with those who are close to them because their opinions are regarded as trustworthy and authoritative.[27]  In such situations, individuals have little motivation to use critical skills to assess the ideologies or question their validity.[28]  The social process underlying radicalization is not limited to face-to-face encounters; exposure to internet chat rooms via propaganda videos or through videos of radical sermons are also part of the process.[29]  A social network not only serves as epistemic authority, validating the narrative for deferential members, but it fulfills a rewarding function, dispensing respect and appreciation to individuals who implement its narrative in action.[30]

Another especially appealing token of significance used by some terror organizations is access to attractive sexual partners.[31]  ISIS, for example, is known for its clever use of sex as an accolade to its fighters.[32]  Sexual access is the most primitive token of significance, and it is frequently attainable through aggressive dominance over rivals.[33]  Young, often sexually frustrated or inexperienced, men are promised a sexual Shangri La for their bravery, with brides eager to marry the fighters for Islam.[34]

Major theories often invoked to explain not just *who* may radicalize but *how*, include identity theory, which posits that the consolidation of identity constitutes a formal stage of a person's development.[35]  In line with this perspective, embracing an ideology and joining radical groups, especially those with charismatic leaders, are adequate means to assuage identity-related crises

---

[22] *See id.* at 44.
[23] *See id.* at 47.
[24] *See id.* at 46.
[25] *See id.* at 48.
[26] *See id.* at 51.
[27] *See id.*
[28] *See id.*
[29] *See id.*
[30] *See id.* at 54.
[31] *See id.*
[32] *See id.*
[33] *See id.*
[34] *See id.*
[35] *See id.* at 69.

and obtain a sense of purpose and self-worth.[36]  The question is not just, "Who am I?" but "Do I matter?"  Extremists are most often unaware they have adopted ideology for motivational reasons, thinking instead that their adoption has to do only with the quality of the ideology, making radicalization a difficult public health crisis to fight.  Unfortunately, the radicalization of American youth continues to occur throughout the United States, as master manipulators scour the internet looking for vulnerable individuals, desperate in their quests for significance.

## V.      Counseling with Deradicalization Experts at Parents For Peace

Professor Kruglanski stresses that family counseling, psychological therapy, and dialogue are the cornerstones of deradicalization efforts; however, if the radicalized individual feels that these activities are pointless or objectionable, deradicalization efforts might fail, creating the potential for recidivism.[37]  Deradicalization programs are more effective for those who, like James, positively appreciate it, and when programs take care of their participants, efforts are likely to be successful.[38]  By contrast, mistreatment in incarceration facilities can fuel resentment toward captors, leading to higher recidivism rates.[39]  Thus, hundreds of criminological studies support the same conclusion: getting tough with radicalized individuals typically does not work.[40]  Understanding the underlying causes of radicalization leads deradicalization efforts to involve providing alternative routes to personal significance.  When alternative means are introduced, the original means comes to be seen as less instrumental to goal achievement.[41]  Striving to ensure that former extremists reintegrate into a stable and peaceful social environment is vital for the prevention of recidivism and should be an integral part of the struggle against violence extremism.[42]

This is what PFP has done for James.  PFP is a registered not-for-profit organization established by an alliance of parents of extremists, former extremists, survivors of extremism, researchers, and clinicians with significant experience with and dedication to compassionate deradicalization and de-recidivism work.  Exhibit D at 1.  The organization views extremism through a public health lens, comparing extremism and hate to addiction, as it often offers people a way of coping with underlying psychological concerns and issues they are facing.  *Id.* at 9.  Over the past seven years, PFP has assisted with hundreds of cases—successfully guiding the off-ramping and rehabilitation of individuals indoctrinated in a wide variety of extremist ideologies.  *Id.*  Since September 2021, two members of PFP, Pardeep Kaleka, counter-extremism specialist, and Mubin Shaikh, former Islamic extremist turned security intelligence and counter-terrorism operative, have engaged James in deradicalization counseling.  PFP has also met regularly with James's parents to help them understand radicalization, connect with other families whose loved ones have been radicalized, and help them improve their relationships and communication with James.

Deradicalization is the process of shifting a person's mindset away from supporting violence as a means for achieving political ideological goals.  *Id.* at 2.  PFP took an interdisciplinary

---

[36] *See id.*
[37] *See* Kruglanski, *supra* note 5 at 187.
[38] *See id.* at 188.
[39] *See id.*
[40] *See id.* at 199.
[41] *See id.* at 191.
[42] *See id.* at 192.

approach to help James appreciate his personal struggles and understand how he "developed the coping mechanism of weaponizing Islam to deal with the difficulties in his life." *Id.* at 3. Professor Shaikh and Mr. Kaleka broke down their sessions with James into three major phases: 1) trust building, 2) challenging, and 3) self-development. *Id.* at 3.

By developing a genuine rapport with James, PFP was able to explore James's childhood grievances and eventual conversion to Islam. *Id.* James described his grievances with the United States government and military, sharing how the West has oppressed his fellow Muslims. *See id.* at 5. James also shared a childhood experience, when a cousin in the military bullied him, which PFP believes fueled his anger towards the U.S. military. *Id.* at 11. That journey into Islam, which led to extreme ideology and rejectionist religiosity, gave James a "sense of misguided superiority and moral righteousness over non-likeminded Muslims and non-believers." *Id.* at 5. In their report, PFP shared James's abstract and utopian understanding of Islam and a life in an Islamic state. *Id.*

In early meetings, James was an idealist, largely relying on dialectical, black-and-white thinking. *Id.* at 11. For example, he frequently stated that if Allah willed him to be arrested and imprisoned, such an outcome was acceptable to him. *Id.* at 5. Moreover, he was unable to grasp the severity of the crimes he had committed. *Id.* Consequently, PFP had many challenging conversations with James about how his belief system was that of a "typically immature white Muslim convert" and how his eagerness and immaturity were exploited by older Muslim men and extremist groups seeking to radicalize young, vulnerable men. *Id.* at 8. Over many months of counseling, "James has grown and matured to understand that life is full of gray and complications, and that it is strength to embrace the uncertainty and vulnerability that comes with life." *Id.* at 11. P4P writes:

> James's journey is a stereotype come to life: an idealized, rigid thinking, lonely white teenager in a predominantly racialized neighborhood who converts to what he thinks is Islam to find structure, identity, purpose, and belonging. Finding camaraderie in this new brotherhood, getting validation and praise, especially by older male figures, and one in which converts are placed on a pedestal. This teenager gets pulled into the orbit of individuals who subtly groom him into their extremist worldview instead of the beauty that Islam provides. This grooming convinces the young, naïve, and disgruntled teenager that his only option is to become hardened in his thinking and exclude anyone who doesn't think like him. This cult-like approach removes the young teenager from the orbit and influence of his parents, his once-close friends, and leads to engagement with violent extremists. …

> … James's story, in many ways, was a mixture of dynamics that came together to form a perfect recipe for his radicalization: an only child who grew up with an identity crisis as being white in a community of color, with a personality that would overly emphasize his own narrative because he found an audience, self-worth, purpose, and belonging, combined with an immature cognitive frame of reference that was extremely black-and-white in thinking. It led to his desire for a utopian life. Wherever his relationships with other friends did not flourish, he would take the reason as a flaw within himself. All this only to find a form of Islam that would

provide him certainty in what seems to be an uncertain existence, while being exploited by older men who he looked up to and sought guidance from.

Over the course of our sessions, James has shown a complete shift in his ideological views, especially as it relates to the justification of violence towards others. Major signs of a poor candidate for deradicalization counseling are they seek to end the session, declare the apostasy of the intervenor, and remain fixed in their position thereafter. James over time has shown the opposite, and he is now willing to find correction in his theology and forgiveness in his heart towards those he may not agree with. The purpose of our interventions was to loosen the rigidity of his views to be more introspective. In the beginning of our sessions, James expressed very rejectionist and strict views against other Muslim groups. Since then, he has relaxed these views and understands that his rejection was largely fueled by his internalized emotions of feeling rejected himself. This is an indicator of an ideological shift within the religious tradition itself and an overall healthier sense of self-esteem.

*Id.* at 10-11. Today, Professor Shaikh and Mr. Kaleka believe that James is no longer radicalized and that he is not a danger to society. *Id.* at 13. He became the first federal defendant with terrorism charges to successfully deradicalize during the pendency of his case. PFP concludes:

This makes us see how James stands apart from most cases we have dealt with. The reason for this is that he has been extremely introspective and reflective about his own vulnerabilities and taking responsibility on how he ended up incarcerated. He has also been thinking about how he could help others upon his release. He's a voracious reader who has already consumed several books during his incarceration, many of those books helping with his own personal growth. It is our hope that James will come out of this experience as an asset to help others who are going down the same dangerous radicalization trajectory of his life. James has already communicated to us that he wished that he had better role-models, especially within Islam. We genuinely believe that James can go on to live a healthy and productive life.

*Id.* at 12-13.

The differences in James have been obvious to everyone who has interacted with him. Initially, he was enthralled in religious and moral superiority, speaking in pedantic, condescending tones. When challenged, he strictly recited passages of the Qur'an, often in Arabic. He was stiff and robotic. While he reads voraciously now, he initially refused to receive any book other than the Qur'an. Positive change was not immediate, and James went through phases of fatigue and depression that reflected his inner turmoil and toxic surroundings. Over time and as his counseling with PFP continued, James softened and opened up. By engaging in non-religious (and religious) conversations and activities, James eventually revealed an identity and personality beyond his identification with his religion. He exhibited self-awareness, insight and self-criticism. Critically, James disavowed radical Islamic ideology and violence. While he continues to have grievances

over legitimate political and social injustices, he now understands how to process and appropriately express those grievances.  This is significant for an individual who was so ardent and uncompromising in his beliefs.  Best of all, we have observed energy, positivity, and a dogged spirit as he has worked hard on himself with the support of his family, community, and legal team.  Once resentful of his family and dismissive of his past life, he has re-established his relationships with his family and is thankful for their unconditional acceptance and support.  With this great change, we believe that he urgently needs to be in an environment that will promote his growth and help further develop his emotional intelligence.

## VI.    Sentencing Guidelines Analysis

### A.   The Applicable Law

In *United States v. Booker*, the Supreme Court expressly invalidated the provision in 18 U.S.C. § 3553(b)(1), which made the Sentencing Guidelines mandatory and rendered the federal sentencing statute "effectively advisory."  543 U.S. 220, 245 (2005).  The impact of *Booker* is that Guidelines sentencing calculations do not bar a sentencing court from using 18 U.S.C. § 3553(a) factors as a basis to arrive at more appropriate sentences.  Sentencing courts are now permitted to weigh factors previously prohibited to achieve an appropriate and reasonable sentence.  This means that when a sentencing court finds a disproportionate relationship between the punishment prescribed by the application of the Guidelines calculations and the particular facts and circumstances of a defendant, an alternative, more appropriate sentence may be imposed.  *See also Kimbrough v. United States*, 552 U.S. 85 (2007).

In *Rita v. United States*, the Supreme Court clarified that the task of the sentencing court requires an individualized assessment of the sentencing objectives enumerated in 18 U.S.C. § 3553(a) for the particular defendant before it, and in the context of all relevant characteristics of that defendant.  127 S.Ct. 2456, 2464-65.  The Supreme Court in *Rita* held that the abuse-of-discretion standard applied to appellate review of sentencing decisions within the Guidelines range but that, while a sentence within an advisory Guidelines range may bear a presumption of reasonableness upon appellate review, the Guidelines are, at best, only a "rough approximation of sentences that might achieve § 3553(a)'s objectives."  *Id.* at 2465.  It is beyond cavil that "sentencing courts, applying the Guidelines in individual cases may depart (either pursuant to the Guidelines or, since *Booker*, by imposing a non-Guidelines sentence)."  *Id.* at 2464.

Beyond the mere mechanical calculation of the Guidelines, a sentencing court clearly must assess the unique aspects and circumstances of a case in fashioning the sentence.  The Guidelines are not a substitute for the district court's assessment and discretion at sentencing.  Rather, they are but one among numerous factors to be considered.  Just as the Supreme Court in *Rita* rejected the blanket presumption of reasonableness for within-Guidelines sentences, in *Gall v. United States*, 128 S.Ct. 586 (2009), the Supreme Court rejected the presumption of unreasonableness for sentences outside calculated Guidelines ranges.

In *Gall*, the Supreme Court held that the Guidelines should be the "starting point and the initial benchmark" for a district court's analysis of a reasonable sentence.  Equally important, the

sentencing judge "may not presume that the Guideline range is reasonable" and "must make an individualized assessment based on the facts presented." *Id.* at 596-597. Moreover, the Supreme Court rejected the appellate rule that required "extraordinary" circumstances or "rigid formulas" to justify a sentence outside the Guidelines range. *Id.* at 595. Thus, a sentencing court, after considering the advisory Guidelines sentencing range, is free to fashion a sentence that is reasonable and appropriate based upon all of the sentencing factors set forth in § 3553(a). *See also United States v. Jones*, 460 F.3d 191, 194 (2d Cir. 2006) (The obligation to consider the calculated Guidelines range "does not mean mandatory adherence.").

### B. Argument

We respectfully request that the Court impose a sentence at significant variance with the Guidelines, pursuant to the Court's authority under 18 U.S.C. § 3553(a). The numerical range deemed applicable to James under the Guidelines fails to include any consideration of the most profound and devastating mitigation factors relevant to James's life narrative—the method by which ISIS and its propaganda served to corrupt his newfound understanding of Islam and lured him and other American youths into believing that its radicalized dogma is a legitimate form of Islamic religious expression.

According to the Center for National Security at Fordham Law School, the average sentence for people who have pleaded guilty in ISIS-related terrorism cases is 11.2 years, with a median sentence of 10 years.[43] Since that report was issued, at least 29 more defendants have been sentenced in ISIS-related federal terrorism cases. The mean sentence of all 43 sentenced defendants is 10.5 years.

A sentence below the mean has been imposed in New York's federal districts and for conduct plainly more serious. *See, e.g., United States v. Mohammed Al-Moayad*, 03 Cr. 1322 (80 months for materially supporting Al Qaeda and Hamas); *United States v. Idriss Abdelrahman*, 09 Cr. 1244 (S.D.N.Y.) (46 months in prison for materially supporting Al Qaeda and FARC); *United States v. Sahim Alwan*, 02 Cr. 214 (114 months in prison for materially supporting Al Qaeda); *United States v. Mahdi Hashi*, 12 Cr. 661 (E.D.N.Y.) (108 months in prison for materially supporting Al-Shabaab); *United States v. Shafal Mosed*, 02 Cr. 214 (W.D.N.Y.) (96 months in prison for materially supporting Al Qaeda); *United States v. Harouna Toure*, 09 Cr. 1244 (S.D.N.Y.) (63 months for materially supporting Al Qaeda and FARC); *United States v. Mohammed Zayed*, 03 Cr. 1322 (E.D.N.Y.) (80 months for materially supporting Al Qaeda and Hamas).

The sentence imposed on Mohammed Delowar Hossain is of particular relevance and import. In March 2022, after a trial conviction, Hossain was sentenced to 96 months' incarceration.[44] At the time of his offense, Hossain was already an older Muslim man, with a wife and family. He played a significant role during the earlier stages of James's radicalization, conversing with him about offensive jihad and extremist ideology— developing and encouraging James's radical views.

---

[43] *See* The American Exception: Terrorism Prosecutions in the United States – The ISIS Cases, March 2014 to August 2017, https://news.law.fordham.edu/wpcontent/uploads/2017/09/TheAmericanException9-17.pdf at 8.

[44] Probation recommended a sentence of 300 months' incarceration, and the Government sought a sentence of 420 months' incarceration.

Hossain was a leader, recruiting a handful of men — including confidential informants — to engage in operative-type behavior to avoid law enforcement detection and gather supplies and other materials to prepare for their trip to Afghanistan to join the Taliban.  James's youth and vulnerability at the time of his radicalization, failure to take *any* steps towards actual acts of violence, and his deradicalization efforts are mitigating factors that clearly distinguish James.  As such, we submit that James should receive a sentence well below Hossain's sentence of 96 months' incarceration.

A critical mitigating factor is James's age, a factor the Guidelines entirely ignore.  For young defendants, courts have imposed sentences under 60 months' incarceration.  For instance, in the Eastern District of New York, Chief Judge Brodie sentenced Imran Rabbani to 20 months' incarceration.  Mr. Rabbani, who had become radicalized, was almost 18 years old at the time of his material support for ISIS activity.  Justifying her decision, Chief Judge Brodie stated that she believed that there was "much more good than evil" in Mr. Rabbani.  Different than James, Mr. Rabbani was prepared to undertake violence, having purchased weapons.  Mr. Rabbani also helped with the planning of a potentially violent attack on Americans with multiple co-conspirators and stole money from his prior employer in furtherance of the plan.  At the time of his arrest, Mr. Rabbani also ran toward law enforcement officers in an attempted attack and made numerous false statements in the course of his interview with law enforcement.  *See United States v. John Doe,* 15 Cr. 302 (E.D.N.Y.).

Courts have recognized that young people who had been radicalized and embraced extremist ideology should be given the opportunity to undergo deradicalization efforts, change, and reenter society.  For example, Judge Michael J. Davis in the District of Minnesota created a program – the Terrorism Disengagement and Deradicalization Program.[45]  Abdullahi Yusuf, 18 years old at the time he attempted to travel to the Middle East to join ISIS, was sentenced to time-served (22 months' incarceration) and 20 years' supervised release.  He participated in the program rather than enduring further incarceration.  Here, unlike Mr. Yusuf, James has already been deradicalized through his participation in counseling with PFP and desires to continue to heal and grow through continued work with them.

### 1.   The Terrorism Enhancement Produces Unjust Results

Section 3A1.4 of the Sentencing Guidelines applies where "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism," as defined in l8 U.S.C. § 2332b(g)(5).  U.S.S.G. § 3A1.4 & comment n. 1.  The Second Circuit has held that by requiring that the underlying crime "be calculated to influence or affect . . . or to retaliate against government conduct," the statute does not require "proof of a defendant's particular motive." *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010).  Therefore, a "person may intend and may commit an offense that is so calculated even if influencing or retaliating against government is not his personal motivation."  *Id*.  By way of example, "a person who murders a head of state" commits an act of terrorism if he knows "that his crime will influence or affect the conduct of government . . . even

---

[45] *See* Ivy Kaplan, "An inside look at the first US domestic deradicalization program."  The Defense Post. Feb. 12, 2019.  Available at *https://www.thedefensepost.com/2019/02/12/us-minnesota-deradicalization-program-inside-look/*.

if his particular motivation in committing the murder is to impress a more established terrorist with his abilities." *Id*. However, this enhancement should be given very little weight in this case, and an equivalent downward variance is warranted. James had no political or ideological motivation for his conduct. His actions were purely to fill a personal need, which both reduces his culpability and increases his ability to be rehabilitated.

Dissatisfaction with the terrorism adjustment is demonstrated by the fact that the overwhelming majority of judges have imposed sentences below the range generated by the adjustment. Since 2008, approximately 46% of all sentenced federal defendants have received a sentence below the Guideline range. Yet, for defendants facing an adjustment under 3A1.4, the rate of downward variance is 77%.

The astronomical Guidelines range in this case derives in large part from the application of Section 3A1.4, which incorporates a 12-level increase in the base offense level and raises the criminal history category of a 21-year-old first offender from I to VI, the category reserved for career criminals with extremely high risks of recidivism. The first flaw with the terrorism adjustment is that "it is not backed by any empirical evidence." *United States v. Jumaev*, 12 Cr. 033 (JLK), 2018 WL 3490886, at *10 (D. Colo. July 18, 2018). The entire Guidelines system "begins with, and builds upon, empirical data." U.S.S.G. Part A, Introduction and Authority ¶ 3 at 5. The Sentencing Commission "took an 'empirical approach,' beginning with the empirical examination of 10,000 presentence reports setting forth what judges had done in the past and then modifying and adjusting past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like." *Rita v. United States*, 551 U.S. 338, 349 (2007). A Guideline promulgated outside the empirical approach does not "exemplify the Commission's exercise of its characteristic institutional role" because it does "not take account of empirical data and national experience." *Kimbrough v. United States*, 552 U.S. 85, 109-110 (2007) (internal quotation marks omitted).

"[N]either the Sentencing Commission nor the courts applying the Terrorism Enhancement have provided *any* empirical evidence to support the presumption that terrorism defendants are uniquely dangerous." Sameer Ahmed, *Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror*, 126 Yale L.J. 1520, 1550 (2017) (emphasis added). In rejecting a Section 3A1.4 adjustment, Judge Breyer recently explained, "[R]epetition of that assertion might give it the ring of truth, but does not make it true." *United States v. Alhaggagi*, 17 Cr. 387 (CRB), 2019 WL 1102991, at *7 (N.D. Cal. Mar. 8, 2019). Indeed, "when U.S.S.G. Section 3A1.4 was adopted, the number of the anti-terrorism cases was tiny, so there could be no analysis of a statistically reliable group of defendants upon which to build a reliable Guideline." James P. McLoughlin, Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 Law & Ineq. 51, 112 (2010). Like the crack cocaine and child pornography Guidelines, the terrorism adjustment in Section 3A1.4 is based on neither empirical data nor national experience, and this Court should use its discretion to reject it. *See United States v. Henderson*, 649 F.3d 955, 962-63 (9th Cir. 2011) (noting that changes to the child pornography Guideline "were Congressionally-mandated and not the result of an empirical study" and so "district courts may vary from the child pornography Guidelines, § 2G2.2, based on policy disagreement with them, and not simply based on an individualized

determination that they yield an excessive sentence in a particular case") (citing *Kimbrough*, 552 U.S. at 109-10).

### 2.   Equating a First Offender with a Career Offender Contradicts the Premise of the Guidelines

Yet another flaw with the Section 3A1.4 terrorism adjustment is that it artificially inflates a defendant's criminal history category to VI even when that person has no prior criminal record. *See* U.S.S.G. § 3A1.4(b).  As with the lack of empirical evidence and the equation of all terrorism offenses, the decision to treat every Section 3A1.4 offender as a career offender contradicts the entire premise of the Sentencing Guidelines scheme.

As this Court knows, part of calculating the advisory Guidelines range involves determining the defendant's criminal history score.  The Sentencing Commission has explained that a defendant's prior criminal record is "directly relevant" to sentencing because a "defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment."  U.S.S.G. Chapter Four, Criminal History and Criminal Livelihood, Part A - Criminal History Introduction Commentary.  Moreover, "repeated criminal behavior is an indicator of limited likelihood of successful rehabilitation."  *Id.*

Unsurprisingly, apart from Section 3A1.4, the only other provisions of the Guidelines that automatically raise a defendant's criminal history beyond the properly calculated criminal history score all involve defendants with aggravated prior criminal convictions.  *See* U.S.S.G. § 4B1.1(b) (automatic assignment to criminal history category VI for career offenders who have prior convictions for drug trafficking or crimes of violence); §§ 4B1.4(c)(2), (3) (automatic assignment to criminal history category IV or VI for a defendant sentenced under Armed Career Criminal Act due to prior conviction for "violent felony" or "serious drug offense"); § 4B1.5(a)(2)(B) (automatic assignment to criminal history category V for certain sex crime defendants with prior sex offense convictions involving minors).  Conversely, the Guidelines authorize a downward departure when "reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes."  U.S.S.G. § 4A1.3(b)(1).

Equating James, who has no criminal record, to someone with an extensive criminal history—such as career offenders, armed career criminals, and sex offenders—is unreasonable and should be rejected.  In fact, application of the adjustment to James is even more unreasonable because he has no prior record at all, as opposed to being in criminal history category I due to prior convictions too old to score for criminal history points.  Sentencing Commission data indicates first offenders like James are at the lowest risk of recidivism of all federal defendants.

Additionally, "there is no published statistical data demonstrating that defendants convicted of violating" terrorism-related statutes "are any more likely to be recidivists than any other first offenders."  McLoughlin, Jr., 28 Law & Ineq. at 114–15.  Likewise, "nothing in the history of U.S.S.G. Section 3A1.4 would indicate that any reliable data was used to determine if a person convicted of a material support offense is more likely to be a recidivist."  *Id.* at 115.

In fact, as Judge Breyer of the Northern District of California recently noted, "[T]here is some evidence that first-time terrorism offenders are no more likely to reoffend than individuals who commit other crimes," based on Sentencing Commission statistics concerning first offenders. *Alhaggagi*, 2019 WL 1102991, at *7. He also noted that "the very limited data suggests that individuals convicted of terrorism offenses do *not* recidivate at higher rates than those convicted of other crimes." *Id.* (citing Ahmed, 126 Y.L.J. at 150) (emphasis in original). As a result, in *Alhaggagi*, Judge Breyer found the Section 3A1.4 enhancement applied but departed to the defendant's true criminal history category of I because "automatically assigning to all terrorism defendants a criminal history category of VI—is inappropriate based on the seriousness of the crime, inappropriate based on assumptions about recidivism, and inappropriate as to this Defendant." 2019 WL 1102991, at *5.

Judge Breyer is not alone. Courts that have applied the enhancement routinely reject the automatic assignment to criminal history category VI as inappropriate. *See United States v. Meskini*, 319 F.3d 88 (2d Cir. 2003) ("A judge determining that § 3A1.4(b) over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' *always* has the direction under § 4A1.3 to depart downward in sentencing.") (emphasis added); *see also Jumaev*, 2018 WL 3490886, at *9 (declining to apply the § 3A1.4 adjustment and noted that, even if it applied, it would grant a departure to criminal history category I because the § 3A1.4 adjustment "substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes"); *United States v. Mehanna*, 09 Cr. 10017 (GAO) (D. Mass.), Dkt. 439, Reporter's Transcript of Proceedings on April 12, 2012 at 69:14-24 (finding the "automatic assignment of a defendant to a Criminal History Category VI [to be] not only too blunt an instrument to have genuine analytical value, but [is] fundamentally at odd with the design of the Guidelines).

### 3. The Terrorism Adjustment Disproportionately Impacts People Under 25 Years

The terrorism adjustment disproportionately impacts people under age 25. James's young age at the time of the offense conduct is a critical characteristic that must be considered. The Supreme Court has recognized that "because juveniles have lessened culpability[,] they are less deserving of the most severe punishments." *Graham v. Florida*, 560 U.S. 48, 68 (2010). The Sentencing Commission in turn has cited neurological research that shows brain development is not fully realized in most people until they turn 25 years old, meaning the brain of a defendant who commits a crime at the age of 21 or 22 is almost as undeveloped as a 16 or 17-year-old juvenile.[46]

In her report, Dr. Akinsulure-Smith explains:

It is important to understand that from 12-25, the brain undergoes a process of restructuring to make the brain more efficient for adult tasks. At puberty, it begins a

---

[46] *See* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research- publications/2017/20170525_youthful-offenders.pdf.

> reorganization process wherein the connections of the brain that are not used fre-
> quently are pruned away to make room for the additional connections it needs to
> make. It also prepares the brain to process and work more efficiently. During this
> time, some connections are lost and due to the upcoming developmental tasks, such
> as needing to become independent and try new things, our brain is structured to be
> more risk-taking and impulsive, or else teenagers would never leave their homes
> and venture out on their own. Many adults do not understand why teenagers occa-
> sionally behave in an impulsive, irrational, or dangerous way. At times, it seems
> like teens don't think things through or fully consider the consequences of their
> actions. Adolescents differ from adults in the way they behave, solve problems,
> and make decisions. There is a biological explanation for this difference. Studies
> have shown that brains continue to mature and develop throughout childhood and
> adolescence and well into early adulthood (about 25 years old).

Exhibit C at 14. As the Supreme Court has recognized and Dr. Akinsulure-Smith highlights, ado-
lescents differ from adults in three important ways that lead to differences in behavior: (1) lack of
maturity and underdeveloped sense of responsibility, often resulting in impetuous decision-mak-
ing; (2) susceptibility to negative influence through peer pressure; and (3) less ability to make
judgments and decisions that require future orientation. *See* Exhibit C at 14; *see also Roper v.
Simmons*, 543 U.S. 551, 569 (2005). The preference for an adolescent's risky behavior rises by a
third of a deviation between ages 10 and 16, and then it declines by a half standard deviation by
age 26. Exhibit C at 15. One can conclude from the body of behavioral and brain studies that
adolescents under age 25 clearly differ from adults in crucial ways that suggest the need for a
different response from the criminal legal system. *Id.*

Adolescents can still be rational. They can understand the difference between right and
wrong. But when confronted with high-stress or emotional decisions, they are more likely act
impulsively on instinct, without full recognition or analysis of future consequences. *Id.* Im-
portantly, ISIS tailors its recruitment efforts to appeal directly to the adolescent brain. Consistent
with data on adolescent criminal behavior and the results of James's deradicalization efforts, ado-
lescent affiliation with extreme groups can be more of a passing symptom of youth than a strong
conviction of adulthood.

In spite of the foregoing, the draconian terrorism adjustment operates to disproportionately
impact defendants under the age of 25. From 2007 to 2017, although such young defendants only
made up 18% of all defendants sentenced in federal court, they made up 28% of all defendants
receiving a § 3A1.4 adjustment. That is, defendants who should "have lessened culpability" and
"are less deserving of the most severe punishments," *Graham*, 560 U.S. at 68, are actually more
likely to receive the most severe adjustment in the entire Sentencing Guidelines. The application
of Section 3A1.4 is irrational in this case, as it grossly over-represents James's criminal history
and the likelihood that he will commit any further crimes. Thus, the Court should give little or no
weight to the adjustment.

### C. Acceptance of Responsibility

James expressed interest in pleading guilty from the early stages of his case.  But he is a very different person than he was then.  Submitted herewith is a heartfelt letter to the Court from James, which expresses pain, remorse, understanding, and accountability for his conduct here. *See* Exhibit A.

Throughout the sentencing process, James has been brutally straightforward and candid. He has never diverted blame to other individuals or circumstances, nor has he offered excuses to condone his conduct.  He has responded extraordinarily well to treatment through his counseling with PFP, and despite some expected bumps in the road, he has escaped the grips of extremist ideology.  According to Dr. Akinsulure-Smith's psychological evaluation report, "James demonstrated the capacity to reflect deeply on his present circumstances, the course his life has taken, and his current situation.  The harsh reality of his present location has led to a growing recognition of his own responsibility and misguided ideology in his quest to make meaning in the world around him.  James's investment in this change has been noted by his high level of engagement [in meetings] and his acknowledgment of the impact of his actions on those around him, particularly on his parents."  Exhibit C at 2.

In James's letter to the Court, he writes:

I realize the great harm that comes from terrorism.  One person being killed is a tragedy. A mother loses her child, a wife loses her son, a child loses his or her father, and a vicious cycle of trauma begins built on hatred and a desire for revenge.  I have learned that violence is not the answer to any problem and that changes can come through intellectual movements and peaceful resolutions.  People should not fight each other over a difference in opinion, nationality, or color.

Exhibit A at 1.

James's rehabilitative efforts and post-offense conduct support that he will succeed moving forward.  Cognizant that he will face inevitable challenges upon his release, James has sensibly planned and prepared for his future.  He has developed hopes and goals of settling down, raising a family and leading a productive, law-abiding life; and he knows that he still has much work to do, and that much will be expected of him.  James made great use of his time during the pendency of the case, despite the paucity of educational programming at MDC due to the pandemic.  He completed five programs, in a variety of subject areas, including anger management; health and wellness; and even a course on Sophocles administered by Columbia University.  *See* Exhibit E.  Although the instant charge and its security designation precluded James from working, he nevertheless dedicated his time to help himself as well as others around him.  Thus, James has: studied sports science, a subject he hopes to pursue in college and beyond; led prayer groups; tutored other in Arabic; and exercised rigorously.  These self-improvement efforts demonstrate intellectual hunger, desire to grow, and that James takes his future seriously.  We ask that the Court acknowledge his exemplary progress and factor his post-offense conduct and voluntary participation in rehabilitative activities in its calibration of James's commitment to long-term rehabilitation, as well as his preparedness for release.

Importantly, that James has wisely used his time to better himself corroborates his deradicalization, because it shows that he plans for a meaningful, yet mundane future. Equally significant, James's post-offense conduct is indicative of maturity, focus, and capability, and are at the heart of the defense sentencing recommendation. Certainly, James realizes that there is more growth and effort required of him. But we continue to believe that James's efforts, coupled with his strong support network, ensure that James will be in position to succeed.

## VII.   Conditions of New York City's Federal Detention Facilities

We respectfully request that, in determining James's sentence, the Court exercise its discretion to account for the harsh conditions of James's detention during the pendency of his case. James, who was only 19 years old when he was detained, has already been severely punished at the Metropolitan Correctional Center ("MCC") and Metropolitan Detention Center ("MDC").

For the first *38 days* of his incarceration, James was in the Special Housing Unit ("SHU"). For intermittent security and COVID-19 pandemic reasons, while in general population, James has spent approximately 11.5 of his 20 months of incarceration under lockdown conditions. During such lockdowns, James is confined to his cell for approximately 22 to 23 hours per day, with no visitation and only limited phone contact. He was allowed out of his cell for 15 to 30 minutes three times a week, within which time he decided between showering, attending to other personal needs, and making short telephone calls to family and friends. Further, the environments in prison, unstable and chaotic under the best of circumstances, had heightened stress and anxiety levels due to fear of infections, poor conditions, aggressive cell and strip searches, understaffing, and the effects of isolation. We believe the conditions of confinement are an important factor in the determination of the appropriate punishment and the restrictive, dangerous and plainly inhumane conditions of James's confinement merit serious consideration.

In light of inmates' acute exposure to a rampantly infectious and deadly disease, a number of Courts in this district — including this Court — have recognized that "the COVID-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals." *United States v. Jones*, 15 Cr. 95 (AJN), Dkt. No. 2865, at 6 (S.D.N.Y. May 26, 2020); *see also United States v. Gross*, 15 Cr. 769 (AJN), 2020 WL 1673244, at *2 (S.D.N.Y. Apr. 6, 2020); *United States v. Nkanga*, 450 F.Supp. 3d 491, 492 (S.D.N.Y. 2020); *United States v. Lizardi*, 11 Cr. 1032 (PAE), Dkt. No. 2523, at 8. As a result, Courts have increasingly granted variances at sentencing based on the harsh conditions at prisons both before and especially during the pandemic. *See, e.g., United States v. Polanco*, 20 Cr. 94 (AJN) (sentence of time-served, four-and-a-half months, for illegal reentry and false statement to an ICE officer, a variance from an advisory Guidelines range of 10-16 months based in part on conditions at the MDC during the pandemic and the likelihood that the defendant would remain detained until deported); *United States v. Paez Vazquez*, 20 Cr. 28 (JPO) (sentence of time-served, approximately six months, despite Guidelines range of 87 - 108 months, taking into account difficult conditions in detention during the pandemic); *United States v. Morgan*, 19 Cr. 209 (RMB) (considering brutal conditions at MDC before and during the pandemic and imposing a sentence of time-served — less than 15 months — where stipulated Guidelines range was 33-41 months and actual applicable guidelines range was 41-51 months); *United States*

*v. Pierson*, 14 Cr. 855 (LTS) (time-served sentence of less than two months on Violation of Supervised Release where Guidelines advised 6-12 months).  For example, during one recent sentencing, Judge Analisa Torres explained that the Court's decision to impose a time-served sentence of three months where the Guidelines suggested 5-11 months rested in part on the reality that detention for three months during "ordinary times is very different from being detained for three months during the COVID-19 pandemic" due to "additional burdens, including increased risk of infection, along with other complications such as the suspension of legal and family visits." *United States v. Rivera*, 16 Cr. 66 (AT).

Incarceration during the pandemic is undeniably much more punitive.  As Your Honor recently observed in *United States v. Aracena DeJesus*, 20 Cr. 19:

> I am mindful…that you have served most of your time in prison so far during the worst pandemic in this country during the past 100 years.  I'm mindful that you may have contracted COVID-19 while in prison.  I'm mindful that your experience in prison as a result of the pandemic, the preceding lockdown, the ensuing lockdown, and your own illness was frightful.  Prison is supposed to be punishment, but it is not supposed to be trauma of that nature or close.

> Bottom line, your time in the MCC was way harder than anyone intended when you were detained following your arrest.  Any mature system of justice, any thoughtful judge in imposing the reasonable sentence here would have to recognize the unexpected and regrettable ardors that you experienced since your arrest in December.

In *United States v. Daniel Gonzalez*, 18 Cr. 669 (JPO), Judge Oetken similarly recounted the stark deprivations that inmates have experienced during the pandemic, stating:

> And I do believe that because it has been harsher than a usual period, that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served. So I think that having served 24 months is equivalent to having served three years.  That's what I believe in terms of how punitive it's been and how harsh it's been.

Consequently, although defendant Gonzalez faced a Guidelines range of 78 to 97 months' imprisonment, Judge Oetken imposed a sentence of time-served, which was the equivalent of 28 months' imprisonment. Like defendant Gonzalez, James has been held under harsh conditions during the pandemic.

Life is never intended to be easy while in prison.  James's incarceration however has been far bleaker and harsher than "normal."  During the first few months of James's time in detention, he worked hard to present a calm, indifferent, and tough exterior, but with time, he reported experiencing insomnia, anxiety, depression, concern about his future, nightmares, and fears of being sexually violated or physically harmed at the jail.  *See* Exhibit C at 11.  The conditions at MDC are nothing short of inhumane.  They are so horrific and untenable that the fact that our criminal legal system subjects any human to them should shock the conscience.  It is a miracle that James came down to nearly every legal visit with his signature smile and positive energy.  Accordingly,

we respectfully submit that in consideration of the brutal conditions James has endured during his detention, along with all of the other mitigating factors presented, a sentence of time-served is appropriate.

## VIII.   The Goals of Sentencing

Pursuant to Section 3553(a), the Court must consider the purposes of sentencing, specifically "just punishment," deterrence, recidivism, and incapacitation as they relate to James.  Assessment of these purposes is often conducted with the view toward the length of an individual's incarceration rather than the propriety of incarceration.  The purposes of sentencing should be examined through a "restorative justice" lens.  "Restorative justice" is a theory of justice that emphasizes repairing the harm caused by criminal behavior.  It does not excuse criminal conduct.  Rather, it seeks to hold an individual offender accountable by meaningfully seeking to repair the harm caused, while allowing the offender to continue to change and engage in supportive activities. *United States v. Cole*, 622 F. Supp. 2d 632, 637, (N.D. Ohio 2008).  Again, the critical questions in assessing the purposes of sentencing as they relate to James are:

- *What happened to James Bradley that resulted in his radicalization?*

Without question, the nature and circumstances of the offense involve consideration of serious aggravating factors.  Our nation must protect itself from the threat of harm from terrorism and take action to thwart the ability of foreign terrorist organization to influence the hearts and minds of our nation's youth.  Our nation, however, should never abandon the enormous potential of its youth, in the pursuit of imposing punishment upon those who become influenced by the sophisticated methods of trickery and treachery employed by terrorist organization like ISIS.  That James was radicalized to express extreme, violent thoughts towards Americans was *by design*.  His conversion to Islam provided clear structure, values, and benefits.  The white convert was showered in adulation within New York City mosques.  Not only did he have a community of people who accepted him, but he experienced a boost in self-esteem, self-worth, and meaning.

Diving deeper into this new life, it was not long before extremist propaganda made its way into the fold.  After hundreds of conversations with older Muslim men who happened to be confidential informants or undercovers, who James looked up to and sought validation and friendship from, hundreds of hours of online lectures by extreme Islamic scholars, hundreds of hours of ISIS movies depicting Ferris wheels and beheadings, he was radicalized.  He committed himself to following violent foreign terrorists disguised as true believers and practitioners of Islam.  There is no way to pinpoint the moment James was radicalized.  Radicalization happens over time.  But it is clear that his involvement in related defendant Hossain's conspiracy and continued support after Hossain's arrest for Islamic extremist groups are both products of that radicalization.  Neither law enforcement nor parental involvement could have thrown him off this path at the time.  It is therefore no surprise that James was undeterred by the threat of punishment at home or the threat of arrest.  He genuinely believed that every decision he made and every word he spoke was in uncompromising devotion to his Muslim faith.  That is the power of radicalization.

James was an immature teenager, chasing a fantasy. He did not have the skills or where-withal to become a real operative. He made "plans" with no promise of success. He never collected weapons, though he had access to guns at his family homes. He never purchased weapons. He had no contact information of ISIS members or extremists abroad, nor did he attempt to contact any such people. He had no supplies—tents, weather-permitting clothes, tarps, sleeping bags, or flashlights. He had no phone that would work internationally. He did not even have a map. James had a few hundred dollars, some essential oils, and the first love of his life who he "rescued" from her childhood home, Arwa Muthana. He spoke about violence, horrific acts of violence, on numerous occasions, and he was involved in two terrorism-related conspiracies, one with Hossain and the instant matter, but James never took any actual steps towards violence, in his entire life, despite opportunities to do so. Notably, the only plan James, a boy at 18 and 19 years old, successfully undertook to completion was finding a wife.

- *What will it take, through rehabilitation efforts, to redeem and restore James Bradley to his family and community?*

In the case of James, further incarceration is counterproductive. In order to meaningfully advance himself, to live productively and responsibly, James requires continued counseling with PFP; mental health counseling; and employment or participation in educational or vocational programming. Such rehabilitative efforts, supported by the evaluating psychologist as well as the deradicalization experts, will promote public safety and will do more to fight extremism than incapacitation through further incarceration. At this stage in his personal and ideological development, James is ready to be reunited with his parents and family.

In *United States v. Bannister*, 786 F. Supp. 2d 617 (E.D.N.Y. 2011), Judge Weinstein determined that specific deterrence is not accomplished by lengthy incarceration. Unnecessary prison sentences aimed at specific deterrence promote higher rates of recidivism. During such sentences, a person loses positive and constructive family and social supports, gains negative influences, and is precluded from educational, employment, and rehabilitative opportunities. In cases like this, continued incarceration could lead to re-radicalization. Without positive support and counseling tailored to James's specific needs, which would not be possible to continue on a consistent and regular basis in BOP custody, and the psychological and physical dangers ever-present in a prison environment, further incarceration will only exacerbate James's mental health conditions and vulnerabilities. There is a risk of re-radicalization if, in the presence of negative and extremist influences in a prison setting, new grievances are formed, potentially jeopardizing the great progress James has made. Though our experts believe re-radicalization is unlikely, they share these concerns. *See* Exhibit C at 18; *see also* Exhibit D at 12.

Our experts also agree that James does not pose a danger to society. Dr. Akinsulure-Smith shared, "It is my opinion that…James would be most amenable to treatment in the community rather than a correctional facility. His risk assessment and my clinical opinion is that James is a low risk of future violence … The community would not be afforded any additional protection by keeping him incarcerated." Exhibit C at 20-21. Deradicalization experts Professor Shaikh and Mr. Kaleka concluded that after James's counseling, he is no longer radical, is not a danger to society and requires structure, stability and normalcy for continued positive growth. Exhibit D at 2.

Furthermore, all agree that ongoing counseling and positive programming will keep James on the path towards becoming a productive, healthy member of society. "James's greatest need to reduce recidivism is to gain access to services that will help him develop the social maturity, cohesive identity, and healthy social support networks that will allow for independent thinking and sound judgment so that he is not swept away by radicalization efforts ... James needs the correct dose of services rather than a set sentence." Exhibit C at 18.

James has a number of critical strengths, including intellectual capacity, the ability for continued education and skilled work, motivation for improvement, and a growing sense of self-awareness. *Id*. at 19. James demonstrates a capacity to learn healthy coping strategies in supportive therapeutic environments. *Id.* Not only has James prioritized his deradicalization counseling while at MDC, but he has kept his mind and body busy and productive. He has completed numerous educational programs offered by the Bureau of Prisons, improved his physical fitness, and has read book after book sent by his parents. Dr. Akinsulure-Smith recommends that James engage in Cognitive Behavioral Therapy ("CBT"), a "comprehensive-behavioral treatment that strives to increase resilience through helping individuals change cognitive, behavioral, and interpersonal patterns that cause problems in their daily life." *Id.* CBT is effective for a range of problems and will help James focus on current problems and how to solve them in the "real world." *Id.* This strength-based therapeutic approach within a community setting will encourage James to consider his actions carefully, rather than impulsively, avoid unhealthy high-risk environments, pursue educational and or vocational opportunities, and set realistic goals. *Id.* at 20. James has built positive connections with many people in his life, including his current deradicalization counselors, Professor Shaikh and Mr. Kaleka at PFP. James plans to continue his treatment with them, with Dr. Akinsulure-Smith's and PFP's recommendation to do so.

There is no legal impediment preventing this Court from imposing a sentence of time-served with a substantial term of supervised release. Indeed, the type of particularized analysis we seek operates to fulfill the goals of the Sentencing Reform Act by asking the Court to inspect the nuances of the life of the individual whom the Court is going to sentence, in conjunction with the nature and circumstances of the instant offense. The degree of supervision we propose for James will mean a decade of drug-screening, mental health counseling, regular visits with a probation officer, limited internet access and oversight of educational and employment activities. This will amount to significant and constant surveillance. While it will curtail and limit his liberties, it is also conducive to his long-term rehabilitation and will help set him on the right path.

This submission respectfully urges the Court to exercise its discretion to impose a sentence of time-served—a sentence that is sensible and befitting of James's conduct, history, and deradicalization efforts. Significantly, Probation agrees that in James's case, the Guidelines recommendation is *far* greater than necessary to address the goals of sentencing. Probation recommends a sentence of 72 months' incarceration, and in support of its recommendation, Probation referenced the fact that related defendant Hossain, who "initially 'recruited' James and influenced his extremist views," received a significantly below-Guideline sentence of 96 months' imprisonment because the success of his plan was unlikely and there was no identifiable victim. *See* PSR ¶ 23. Addition-

ally, Probation points out that James's youthful age at the time of the offense, his continued familial support, engagement in deradicalization counseling, and acceptance of responsibility are further mitigating factors.

"[W]hile there are many competing considerations in every sentencing decision, a sentencing judge must have some understanding of 'the diverse frailties of humankind,' and a 'generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017). Mercy too, *must* play a role in determining a just and fair individualized sentence (emphasis added). *United States v. Kloda*, 133 F. Supp. 2d 345, 349 (S.D.N.Y. 2001). Our recommended sentence of time-served with a 10-year supervised release term is a meaningful, substantial punishment by any measure. It appropriately reflects society's designation of the instant offenses as serious and meritorious of punishment, promote respect for the law, and provide "just punishment." Such a sentence would also provide adequate deterrence and protect the public because James's deradicalization and continued commitment to rehabilitation demonstrate that there is little to no chance of recidivism and that he will engage in a productive, law-abiding lifestyle. Lastly, our recommended sentence reflects the belief that as a young person, James Bradley can and is committed to the continued redirection and transformation of his life.

## IX.    Sentencing Recommendation

We acknowledge and understand that the charges here are of a serious nature. Expressing desire to join forces with a foreign terrorist organization such as ISIS, which seeks to engage in extreme acts of violence, is an act for which punishment must be imposed. However, the length of punishment under our sentencing regime must be balanced against other factors. James is more than his transgressions, and he will offer much more good to society in the future. He is an intelligent, funny, and compassionate young man, who prior to his arrest in this case, was struggling to understand his identity and find his purpose.

James understands that he has caused a great deal of harm to his community—to the village of friends and family, who have always stood beside him, Arwa, and his fellow Muslims. "I have said many things on the undercover recordings that honestly scare me. I have changed so much since those times," James reflected. Exhibit A at 1-2. He has been chastened by his experience and has accepted responsibility in the realest possible way. Imposing unnecessary confinement to satisfy mythical standards of punishment and retribution is not accountability in this case. James decided long ago to make an active commitment to accountability by willingly participating in counseling. Through it, he has learned the truth about the utopia he once chased, the violence he once glorified, and the extreme ideology he once said he would die for. James has fully deradicalized *while* having to survive a period of incarceration under conditions no human being should suffer. And he is the first person in his position to do so. He is, quite simply, resilient.

Our system is built on the idea that dangling punishment will keep people on the "right path," but it was not incarceration that corrected James's tragic stray off course, it was treatment, rehabilitation, and support. It was time and resources. Through extensive deradicalization efforts, James not only worked through countless moments of anger, confusion, desperation, and grief, but

was reminded of true joy, love, and community.  That is what heals, and James knows his journey of rehabilitation is not over.

James's potential cannot be overstated.  His contributions to our world will far outweigh any supposed benefit of incarceration.  James still has much to learn, as does every 21-year-old, but the work he has done during the pendency of his case is nothing short of extraordinary.  After weighing the § 3553(a) factors in this case, we believe that a sentence of time-served, with a 10-year supervised release term, for James Bradley, is "sufficient, but not greater than necessary," to serve the purposes of sentencing.

*Respectfully submitted,*

/s/

Richard J. Ma, Esq.
Anthony Cecutti, Esq.
Kestine M. Thiele, Esq.

*Counsel to James Bradley*

cc:    AUSA Jason A. Richman
       AUSA Kaylan E. Lasky
       (via email)

# Exhibit A

*(James Bradley's letter to the Court)*

Dear Judge Engelmayer,

**1**

I realize the great harm that comes from terrorism. One person being killed is a tragedy. A mother loses her child, a wife loses her son, a child loses his or her father, and a vicious cycle of trauma begins built on hatred and a desire for revenge. I have learned that violence is not the answer to any problem and that changes can come through intellectual movements and peaceful resolutions. People should not fight eachother over a difference in opinion, nationality or color.

Terrorist organizations and states encourage people to commit acts of violence against innocent civilians in order to take revenge or even the score, this is a belief that I no longer subscribe to. I do not think that taking violent measures or threatening people over differences of opinion is a correct or productive way of expressing one's point of view, it is wrong. I have said many things on the undercover recordings that honestly scare me, I have

I have said many things on the undercover recordings that honestly scare me. I have changed so much since those times.

2

Since the age of 12 I have been studying various religions from Tibetan Buddhism to Judaism. I grew up in a practicing Roman Catholic household, went to a Roman Catholic Elementary and middle school, and was a member of a latino catholic youth group in Washington Heights. Throughout my life I have found myself turning to God in times of adversity.

At the age of 16 I began studying about Islam. I had never studied about Islam before then. Upon learning about the foundational teachings of Islam I immediately became facinated in its creed and acts of worship. I was shocked to see so many similarities between Islam and the other Abrahamic faiths. It seemed as if everything I was learning aligned with my personal beliefs. I was finding answers to questions about my faith that I had been struggling with for years.

After studying Islam for eight months I decided to convert. After my conversion I strived to perfect my moral character. Islam gave me guidance on how to improve my relationships with my family, neighbors, peers and elders, in a concise, easy to understand way. I continued to excel in Boy Scouts and in school. I earned my Eagle Scout Rank, scored an 1130 on my SATs and maintained a solid average in my AP spanish class.

Many of my peers, teachers, administrators and deans at my highschool were very shocked at my sudden positive changes and congratulated me. As I began attending congregational prayers in various mosques I was warmly welcomed into the Muslim community. Everyone that I met was thrilled at my conversion and offered to help and teach me. I began taking Arabic lessons in a machassa and in six weeks I was able to read Arabic. I studied with various teachers who studied abroad. I am now able to read, write and speak classical Arabic.

4

Although I found a welcoming community outside, I clashed with my parents due to my conversion to Islam. My parents were understandably concerned about me.

During this time I began to learn about injustices committed by America against Muslims. I learned about Abu Gurayb, Guantanamo Bay, and the various massacres committed by American armed forces in Iraq, Syria and Afghanistan. The most disturbing actions being the indiscriminate American air strikes that often kill women and children. I was very distraught at this.

I come from a long line of service members since the Civil War. My uncle who I have been close to my whole life is a Marine-vet, his father was in the Navy, and my cousins are both Navy officers. I had intended to follow the same path as my uncle and grandfathers and great-great grandfathers and enlist in the Army after highschool and be an Army Ranger, an elite battalion from amongst the Army's various special-operations groups

5

and divisions. I had learned about them
at a presentation I attended as a Boy Scout
at West Point. I met soldiers in fatigues,
battle-rifles in hand, sporting night-vision
goggles over their helmets at this weekend long
Boy Scout trip to West Point. They put
us through obstacle courses through mud
and they were kind and soft-spoken to us
during our rest-time between events.
However, after learning about the situation
in the middle east and the various ongoing
atrocities I changed my mind.

At around this time I met
agents and informants that recognized
my grievances and encouraged me to take
armed action against the American
military. I was taught that in order
to combat such oppressions againts
Muslims, attacks on American military
and government personell were justifiable
and encouraged.
I began watching ISIS and al-Qaeda
videos which showed their cause and actions

as just, that they avenge the blood of
innocent Muslims.

6

I began discussing my ideas
with my closest friends who happened
to be informants and agents. They commended
me on my enthusiasm for justice and fighting
for it, I am not at ~~bas~~ all blaming them
for my actions. I made my own decisions.
The informants and agents were all 15 to
20 years older than me and I really
trusted and looked up to them. I
thought that they would never steer
me in the wrong direction. Upon Haissam's
arrest I should have taken the warning from
law enforcement. I was still committed to
previous extremist thinking and views, I
was a lost kid that was deeply entrenched
in his incorrect beliefs.

I married Mrs. Arwa Muthana because
I fell in love with her and not because
I wanted a partner to commit a crime
with. My marriage to her gave me ~~another~~
another purpose. She changed my life.
I learned from her the meaning of compassion
and care. She told me she had no doubt in me.

7

I am not a bad person, but I made some bad mistakes. I failed myself, my wife, my parents, and my religious community. I completely regret, and am repulsed by my previous statements regarding committing an attack on West Point, a place I have so many good memories at, and on ROTC cadets at the university that I attended for one semester. I am embarrassed by all of this.

I have been learning and growing so much with Parents for Peace. Mubin and Pardeep have taught me how to deal with my grievances and what are appropriate ways to push for change. With Mubin and Pardeep I discuss a variety of topics. I do different healing and therapeutic exercises led by Pardeep and with Mubin I discuss all sorts of theological subjects and always find them very engaging and fulfilling. They always challenge me and seek to expand and widen my views. I look forward to continue to work with them.

8

I know I have a lot of work to do. I know I have to mend my relationships, between my parents, friends and community. I need to further my education and finish college. I need to continue my counseling once I leave in order to keep myself balanced mentally and emotionally. I will continue to do everything I can to secure for myself and my family a positive and healthy life. I have absolutely no intention of committing violence in the future.

I work on my growth everyday in prison. My mind is on setting myself up for a successful future. I take all available courses from the education and psychology departments. I plan on pursuing a degree in the near future, perhaps in sports science or writing, two of my passions. I have aspirations to continue my involvement in volunteer work with the Scouts, and to pursue a career related to fitness or counselling as well as various business ventures.

9

Through my self-reflection and counselling, I've learned what it means to be a responsible husband and father. I am so excited to have a future with Mrs. Muthono. She has been my rock throughout my incarceration and has encouraged all of my rehabilitative activities from my counselling, to my studies and my exercise regimen.

Finally I would like to express my deep regret and remorse for my past statements and actions. I no longer have the desire to fight American soldiers overseas or any soldier from any country, domestic or abroad. I've let down my parents and family, and to them I apologize. To my mother and father, I have put dirt on our family name and broke your hearts by my illegal activity that led to my arrest and incarceration. I have seperated this family through my actions. Please forgive me. To my beloved wife; my Anna; I was not thinking straight when I paid for us to be smuggled out of the country. I put us in great danger, which is something that I will make up strive to make up for, to you, for the rest of my life. James Bradley

# Exhibit B

*(letters from friends and family)*

Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

December 14, 2022

Re: The United States v Bradley, et al., 21 Cr.277 (PAE)

Dear Judge Engelmayer,

How does a mother write such a letter? I could begin by telling you what a delightful child James was from the day he came into our lives and all the way through his early adolescence. I could tell you stories of how much joy he brought to us and how goofy and funny he is. That said, he could also be annoying and annoyingly stubborn. If he was interested in something, he was all in. When he started martial arts, he continued on until he became a black belt. When he took up the trumpet, he was serious enough about it to get into LaGuardia High School for instrumental music. When he started Boy Scouts, he absolutely loved it from the very start. He decided early on he would go all the way to Eagle, which he did. Everyone who knows James will have stories about his sense of humor, his curiosity, and his openness; however, every story will end with James being in the situation where you find him.

It would be a gross understatement to say that never in my wildest dreams did I think we would find ourselves in this place. I lacked the imagination to foresee the path James was taking. Believe me when I say I would have handled things differently if I had known more about recognizing and addressing radicalization. At that time, though, we were groping in the dark and were utterly surprised by the turn of events. We did not know where to turn for help, and by the time things came to a head, he slipped out of our grasp. However, over the past two years, Greg and I have learned a great deal about vulnerability, radicalization, and the pathways to extremism. I wish we had had this information before, but I can't imagine a scenario in which we would have been in a position to be better informed. We had only become acquainted with Parents for Peace a week or so before James was arrested. I can say now, though, that we are better equipped to support him in the next phase of his life.

James was raised in a Catholic household and attended Catholic school from PreK4-5th grade. We attended mass weekly, and James was a regular altar server. James was fascinated with religions and how people practiced their faith from a relatively early age. Starting in middle school, he was deeply interested in  Buddhism, Judaism, and Santeria (which dovetailed with his interest in his Hispanic heritage). He shared his interests with us, and we had many conversations about how people express their faith and incorporate spirituality into their lives. We often spoke about the fact that people worshiped differently and there was no one right way. At a parent-teacher conference in his sophomore year, one of his teachers told me James always seemed to bring the discussion around to religion when he spoke up in class. We laughed about that because I said that because he did the same at home.

James struggled to find himself in a large New York City public high school. At the end of his freshman year and the beginning of his sophomore year, he experimented with marijuana and tried to find his place. He made friends but didn't find a core group of high school mates. Thankfully, he had his peer group in the Boy Scouts and in his martial arts practice, which helped keep him on a steady path. In his junior year, he told me he sometimes stopped off at Saint Patrick's after school to pray. I questioned him about his need to do so, and he said it was just something he felt he wanted to do. His conversion to Islam followed a different path, though. In the past, when he was interested in a particular faith, he

shared that interest with us. He did not do this with Islam. We had no idea he was exploring Islam, and when he informed us that he had converted, it came as a complete shock. His conversion began a challenging time for us as a family. Looking back, I regret my initial reaction to his conversion and I wish I had responded differently. I had understood conversions from my knowledge of other faiths, and I did not understand how he could've converted to Islam without a series of classes, religious counseling, and family support. James, as he has done with most things that interest him, jumped in feet first. We were, of course, concerned with the drastic change in his behavior, clothing, outlook, and to be frank, his sudden intolerance of other religions. This lack of tolerance was the most troubling aspect for us; it was a stance that differed drastically from his previous way of viewing the world.

We had numerous explosive arguments about his religious extremism. He became rigid in his practice and in his interactions with anyone outside of the Muslim faith. Sometimes, your Honor, I could barely recognize my son. The words coming out of his mouth seemed to channel someone I did not know. He started memorizing long tracts from the Quran and quoted them to us during our discussions. He appeared to have become incapable of forming an opinion of his own. In a conversation on any subject, he would refer to a quote from the Quran or one of the hadiths. James was enrolled in a high school in an instrumental music program. His new faith did not allow him to play an instrument. In support of his conversion, I advocated on his behalf to relieve him of his music classes in his senior year. As difficult as this was, though, we still had many wonderful family times, and the time he spent with us during the summer in the Catskills was always lovely. I think this might be one of the reasons why we thought he might grow out of what we thought was a "rebellious phase." While he was highly rigid and judgmental in certain interactions with us, there were also many times when he was his same fun-loving, humorous self. One of my fondest memories of this time is working remotely from our place in the Catskills. James had been hired by a couple of our neighbors in our bungalow colony to do some carpentry work, and during the course of his day he would cross in front of the window where I had my office. He would do dance moves, back flips, and handstands to amuse me from my vantage point. It's a very confusing time for us as a family.

Things ramped up when he moved to Albany to start college. We learned mid-semester that he had not been attending classes and that he had been visiting a mosque in the Albany area. He came home in October and said he didn't want to return to college. We had a counseling session with a Muslim teacher James was studying with, who he respected greatly, as did we. With his guidance, we thought we had come to an understanding that James would continue his college education, at least through his freshmen year. However, he came home in December and said he was not returning. This news was so disappointing; we hoped he would go off to college, have new experiences, make new friends, and become involved with other causes. We thought James would grow out of this phase he was going through. From this vantage point, I can't believe how naive we were.

We told him that if he took time off, he would have to find a job, which he did. However, in March 2020, the pandemic set in, and James was home. During this period, he spent hours upon hours on YouTube listening to lectures on Islam. I could see him watching videos of clerics, but he had his earbuds in, so I could not hear what they were saying. At one point, the time he spent viewing videos on his computer became too much. We told him he could not use his computer for anything other than schoolwork or job hunting. He then proceeded to do everything on his phone and became even more secretive. He was spending a lot of time going to the mosque for classes, or so he told us. We now know he was spending time with an individual he thought shared and supported his extremist views. Things came to a head in December 2020 when a very close family friend died unexpectedly. James would not go up to see them and comfort them during this time of grief. James had known this family his entire life and had been close friends with their son. Greg and I realized that something must be very wrong for him to behave in this way - it could not have been more out of character. This is when we shifted our thinking and started

scrambling for help from all sorts of sources, including a private detective and the FBI. Needless to say, we were not able to intervene in time to save James from himself. On the day he was detained, we learned he had married a woman over Zoom and planned to leave the country. You cannot imagine our shock at this news. The past nearly two years have been the most painful time in our lives.

James has many gifts, and we hold on to the hope that he has a bright future ahead of him. He was arrested at 19 years of age and turned 21 in May. That he is incarcerated during this critical phase of his emotional and cognitive development is deeply distressing. I can't tell you how painful it is that this stage of development is occurring in a setting that could not be less conducive to growth, maturation, and exploration. James's path to radicalization was a perfect storm of psychological conditions; he was isolated, vulnerable, and seeking a way to make sense of his confusion. Unfortunately, he found older, more knowledgeable companions that encouraged him down this path instead of true and faithful Muslims who could have steered him in the right direction.

That said, I could not be prouder of how he has borne the extreme circumstances of his incarceration. He has drawn on a very deep well of strength to get himself through this ordeal. Being incarcerated is a terrible experience but being detained during COVID has been difficult in the extreme. Due to these constraints, we were not able to visit him regularly. We went for nearly eight months without an in-person visit. He set himself to reading and writing and working out on a rigorous schedule to keep himself whole. He has shown remarkable fortitude and self-possession under the most extreme circumstances. And surprisingly, he has managed to maintain his goofy sense of humor and a hopeful outlook for his future. I can't say I know how this experience will affect him going forward, but I do know that, given the chance, he has it in him to overcome this frightening, terrible experience. He is young and can put this experience behind him and be a force for good in the world. He is idealistic and caring and wants to find a way to make a difference.

In your deliberations, your Honor, I hope you can consider James's youth. I absolutely believe that his radicalization came from psychological vulnerability and not from violent, criminal intent. Through our work with Parents for Peace, I have learned that extremism is a type of addiction. Individuals, often young, vulnerable teenage boys, are looking to make sense of their lives, and this is the path they take. Greg and I believe that James's healing and development would be much more likely to succeed if it took place outside the criminal justice system. We hope, in your mercy, you can take this into consideration when sentencing him.

I have not lost faith in my son; I know we will come through this as a family. Greg and I love and support James, and we will continue to provide this same love and support when he is returned to us.

Respectfully,

*Sandra Bradley*

Sandra Bradley

Here is a picture of the three of us outside of La Guardia High School.  James is 16 in this photo.



Honorable Paul A. Engelmayer

United States District Judge

Southern District of New York

40 Foley Square

New York, New York 10007

December 14, 2022

**Re: <u>United States v. Bradley, et al.</u>, 21 Cr. 277 (PAE)**

Dear Judge Engelmayer:

I am Gregory Bradley the father of James Bradley.  I am a high school math teacher at Croton-Harmon High School in northern Westchester County. I have a bachelor's degree in mathematics, a master's degree in math education and I completed a two-year professional actor training program in New York City in 1990. I toiled anonymously in the downtown NYC theater scene for a decade while working in a drug treatment center in the south Bronx as a math and reading teacher. My future wife was a fellow cast member in a stage adaptation of Dostoyevsky's "The Brother Karamazov". When our son was born in 2001, I returned to the high school classroom.

From an early age James demonstrated a curiosity and wonder of the world, nature, human relationships and the divine. My wife Sandra and I were raised Catholic and we raised James Catholic. For a time, he went to a Catholic elementary school before transferring to the middle school of the district where I am employed.  We discovered he had an ear for music and languages. We encouraged his musical gift with private trumpet lessons which led to his acceptance into LaGuardia High School where he graduated in 2019. Along the way he discovered music was not his passion. This was discouraging to him along with the struggle to find friends who matched his talents, interests and skills. As a teacher, I have long witnessed how teens struggle to simultaneously stand out and fit in. James' struggle seemed intensely personal. The combination of this and an abiding curiosity of the divine led him to not only research Islam but learn to read, write and speak Arabic. Soon, without our knowledge, he converted at the age of 17. This secret conversion concerned us as it was uncharacteristic and soon created a disturbing rupture in our close knit and loving relationship with him.

It wasn't until mid-summer of 2019 when the FBI showed up at our South Bronx co-op that we knew of James' association with Delowar Hossain. Hossain, 31 years old at the time, at a Mosque on the upper Eastside of Manhattan, approached James with an extreme interpretation of Islam, a young boy in the throes of uncertainty and always willing to impress adults. The FBI agents informed me on that day that they knew about James because Hossain had put his name on a fly list in his plan to leave the country and fight for ISIS. Fortunately, James was steered clear of him with the help of a sympathetic and aware member in his newly adopted Muslim community.  We were in disbelief that he would ever be so negatively influenced.

In the fall of 2019, while James was off to college, FBI agents contacted me to "checkup" on James and would contact me again in January of 2020 after he decided not to return to college explaining to me that their intention was "preventive".  I would learn on March 31, 2021, the day of his arrest, that the FBI had "a case on him for two years". Checking up on him was not what they were doing but rather trying to get

information from me, his father. Being inexperienced in these matters I was deluded.  Although they appeared sympathetic, they were not and are not social workers. Indeed, James befriended a man who he considered a "fellow worshiper" who he found out in his third month of incarceration was an undercover agent recording his every word, even videotaping him.

My wife and I had no idea what was about to unfold. To our horror we soon realized that our beloved son, an Eagle Scout, a black belt in MMA, a promising student, the naturally sympathetic, humorous and soulful human we knew and loved, was out of our reach, alienated, distant and detached. We would not surrender to despair. We turned to a couple's counselor for support desperately searching for a context for his behavior, innocent of the insidious nature of radical extremism. We began working with Parents4Peace, a non-profit organization that supports families whose loved ones have been affected by extremism. They have, as I am sure you are aware, provided effective counseling for James who we believe over the past year has made significant progress in the journey toward his true self.

We, his parents, are well aware of the criminal charges brought against our son, we carry the pain of it with us daily. These past twenty months of incarceration have taken a toll on the three of us. Extended family and many close and even distant friends have experienced our pain. We are eternally grateful for their tireless love and support. We believe the rupture in our relationship with James has begun to heal as we have written to James, sometimes daily, spoken to him on the phone and have had a number of visits.  We know that James recognizes his erroneous thinking and the path it took him on. Myrieme Churchill, the executive director of Parents4Peace, early in our relationship stated that the real healing will begin when James realizes that he was manipulated and used.  The pain of such a realization will run deep and is inevitable as James is an honest young man who has a desire to grow and learn. He needs to be with his parents.  He will not heal in a prison cell.


I know and understand what you are charged to do Judge Engelmayer and I respect it.

I simply ask for your mercy.


Sincerely,

*Gregory J. Bradley*




At far left, James,17, and two fellow Scouts at the Loveland Pass, Continental Divide in the Colorado Rockies.

Summer of 2018, Boy Scout Troop 662, high adventure backpacking trek that included the Maroon Bells in the White River National Forrest and a climb to the top of Mt Bierstadt (14,060 ft). Within the coming year James would achieve the rank of Eagle Scout.

Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re: <u>United States v. Bradley, et al.,</u> 21 Cr. 277 (PAE)

Dear Your Honor,

My name is Ethan Kue and James is a good friend of mine through our time in Boy Scouts together and due to our parents being good friends. We connect during the Bradleys' annual holiday party and spend a weekend together during the summer with our families.

I first met James when my older brother and I switched Boy Scout troops. James was one of the younger scouts, as he was still in middle school, and I was about to start high school. He immediately stood out to me due to his infectious smile and his knack for consistently being early to weekly meetings. When we first met, he went by the nickname "Bucky" and was endeared by other young scouts as he always made sure to include everyone and enjoyed hanging out with them before and after meetings. Over time, I also picked up on James' dedication to scouting, as his work ethic and embodiment of the Scout Oath and Law led to him advancing up the ranks quickly. When I became the head scout leader for the troop, James was a reliable emerging leader and a role model to fellow scouts.

James' journey outside of scouting was different though, and it seemed due to outside influences hurting his identity and, as a result, his spirit. Others, both in and out of Scouts, challenged James on his cultural identity, and as a result he started to sternly reject his childhood nickname and actively try to establish to others that he was not White, but Panamanian. James wore a headband with Panama's flag on it before and after meetings. He also began to strike up conversations with me and others where he'd share facts about traditions he knew and Panama's history.
This identity shift and strong desire to prove himself as part of his mother's culture was due to James' interracial background, something I empathize with him on. James is half Hispanic and half White. I'm half Chinese and half White.

As a mixed race person, it can be challenging to feel like you fit in because being half one culture and half a second culture often leaves you feeling like you're not enough of either culture to be accepted. Kids will ask you to prove to them that you're part of the same culture as them and can end up damaging you when they tell you that you aren't actually Chinese/Panamanian. Even adults can make you feel like an outcast when they take an extra glance at you or ask you about where your parents are from in front of a group of people.

Two other events had a long-lasting, detrimental effect on James. Early in high school, he received a fancy belt that he really wanted from his parents. James was really proud of this gift but was scarily robbed at knifepoint in a public restroom, and the expensive designer belt was stolen from him. This unnerving event shook James's worldview and harshly forced him out of being a kid. The other life event that shaped James and.

0him to adopt Islam was when my younger brother, Matt, and him were on a week long Boy Scout camping trip. One of the other Scouts came to James and Matt and told them that they were missing money and thought that someone else in the group had robbed them. They investigated it on their own and when they told the Adult leader on the trip about the issue, he punished everyone involved equally and the kid who stole the money didn't get in any more trouble than James and Matt did, even though they had done nothing wrong. This incident was a major factor in my younger brother's decision to switch Boy Scout troops, but James decided to stay as he was only a year or so away from completing Scouts and obtaining Eagle Scout. The poor handling of the situation by the Adult leader, someone who had been entrusted to take care of all of the Scouts during the trip, tarnished Matt and James' scouting journey and weakened their trust in Boy Scouts as a whole. James has always been someone that embodied the Scout Oath and Law and Boy Scouts was a community that he had been able to be himself and felt at home, but I believe this really changed how James felt because I saw firsthand how much it affected my younger brother.

Everyone wants to find acceptance and a community they can rely on and feel safe in, and all of this rejection and loss of trust pushed James to find somewhere that he would be accepted as he was and not looked at or treated differently. James seemingly found this community where he felt accepted and aligned with their values when he became a Muslim. Like with Boy Scouts, karate, and any other endeavor James took on, he strove to be the best Muslim he could be. Unfortunately, his devotion was taken advantage of and preyed upon through his limited ability to read or speak Arabic, the language of the Quran. Coupled with the jarring experiences mentioned above, he was manipulated.

James lost his way and made poor decisions as he searched for a community that felt safe, shared his values, and that accepted him as he was. A community that didn't say that he wasn't white enough or Hispanic enough. The actions he committed are not a representation of who James is at his core. James is a bright young man whose smile lights up the room, loves to crack funny jokes, and is a loyal and empathetic friend. I have firsthand seen the best James is, and he is still that person. I implore you to give James leniency as you determine his sentencing. More than anything, he needs to be with friends and family as he receives support to try to overcome everything he has been through.

Nov 3, 2022

Honorable Paul A. Engelmayer

United States District Judge

Southern District of New York

40 Foley Square

New York, New York 10007

RE: United States v. Bradley, et al., 21 Cr.277 (PAE)

Dear Judge Engelmayer,

We met James and his parents, Sandra and Greg, when my oldest boys transferred to Boy Scout Troop 662 about 8 years ago.  Greg and Sandra both held positions on the board.  James was fondly called by his nickname "Bucky" and was very into his Panamanian heritage, wearing a beaded necklace of their flag-visible when the boys took off their uniform shirts to play a friendly game of Dodgeball at the end of the meetings. Because we lived 4 miles away, I always drove my boys to the meetings and stayed to observe and help where I could. I volunteered to help Sandra sort out advancements and badges before an awards ceremony and we became friendly.  I know my 2 oldest sons liked James even though he was younger because he had a good sense of humor and was outgoing. He also played the bugle at camp outs, a real bonus for any troop to have a live "Reveille" and Taps. When my youngest was 10 years old ,he also transferred into the same troop and he was about 2 years behind James. However it happened, James and my youngest were good buddies and shared tents at summer camp and other camp outs with my oldest sons looking out for both of them. Our families got closer too, both dads are Math teachers and Sandra has a wit that always makes me laugh.

 James got into the prestigious La Guardia High School for his horn blowing talents.  Like most teenage boys, he got swept up into name brands and fashion and asked for an expensive belt for his birthday. After much thought and discussion, his parents decided to buy it because they knew James was a good kid and they wanted to acknowledge and reward that behavior for his birthday. Within the first week of wearing that belt, James was mugged in a NYC public bathroom and the belt was stolen.  I think that was the beginning of some changes in James. He had always been a happy go lucky kid that left you feeling like he was trying to figure it all out – where did he belong in this world, who were his people, what was his purpose. Now he knew the harshness of the world firsthand.

Some members of the Troop signed on to attend Philmont, a rigorous once in lifetime camping experience, including James and my youngest, Matthew. It was a small group and my oldest boys were working and couldn't go. I was nervous to let my 14 year old go but I was reassured when Matt said he would tent with James. In addition, Greg was also going as assistant scoutmaster. As it turned out, they didn't wind up going Philmont because of the forest fires but the Head Scoutmaster set up a trip to Colorado instead. During the trip, here was an incident with stealing that involved 2 other scouts. Matthew and James decided to stand with the "victim" and help him deal with the matter themselves. It got a bit muddled but in the end, James and Matthew were honest and the other 2 scouts were not. We had many discussions about the incident, as a family and with the Bradleys as well. I think both boys

were shocked that an older scout in a leadership position could steal and lie and the Scoutmaster's solution was to punish all of them. It still doesn't sit well with my sons.

 It wasn't long after that James found Islam. I remember Sandra telling me they had had many conversations about all the different religions , usually around the dinner table. Devout Christians that attended church regularly, their family conversations left Sandra and Greg with more to think about for themselves and they appreciated the intellectual challenge. I remember very clearly when Sandra told me in a phone conversation that she and Greg thought they were doing a good job of keeping James engaged with them on his thoughts. He had decided to convert to Islam with a simple sentence repeated 3 times and it was so. How outrageous that he took that so seriously, she said.  Sandra shared her worry with a chuckle when he asked her to start only serving Halal food and wanted to dress in typical Muslim garb.  She was concerned when James decided he wouldn't dress up in his Boy Scout Uniform to accept his Eagle Scout Award, stating secular awards didn't interest him anymore. My boys and I discussed it and we were all sad because the whole troop had helped and it was a big accomplishment.  When James started SUNY Albany where my oldest was already attending, I offered a positive- she wouldn't have to worry about him smoking and drinking or joining a Fraternity. My oldest son, Nathaniel, told me he saw James not on campus so much as furiously peddling down one of the major avenues in Albany trying to get to the mosque for the 5x a day prayer ritual. It seemed he had a fervor to be THE BEST muslim.

 James came home after one semester at SUNY Albany. Again, Sandra expressed relief that James was under their roof where they could look out for him.  James got a job as a house painter and was trying to learn Arabic/ the language of the Quran and prayed constantly.  She sent me a video of him at their little bungalow community doing cart wheels , laughing and being silly-something she hadn't seen in him for a long time- the "old James" she said.  She was so worried about him but thought as long as he was under their roof, they could watch for any self harming behaviors.

The news of his arrest went around our family chat like a wild fire- couldn't be our James, could it? How could this happen? Sandra and Greg got into a ritual of going to pray below the window of the cell where he was being held on weekend mornings. I went to pray with them, my middle son, Ethan, or my husband accompanying me.  I again offered Sandra my only positive view; James was stopped before he did something that caused harm to anyone or himself and for now was safe from harm and outside influences/contacts other than his parents. It seemed like he had been brainwashed or joined a cult but somewhere in there was Bucky, the kid we knew. Greg sent out updates and eventually it seemed the grip of extremism started to loosen and James has started to comprehend what happened to him and shows signs again of the son they raised. I am so grateful and relieved. In his heart, James is a good kid who was looking to belong/ identify with something bigger than himself.  Someone/something took advantage of that and groomed him into something he isn't.  And from what I understand he is awakening.

I am a Physician Assistant by trade. I tell everyone I am holding my breath until my boys all reach the age of 25 when their prefrontal cortex will be fully formed.  The prefrontal cortex is responsible for executive functioning (planning, decision making, moderating social behavior).  Google "functions of the prefrontal cortex " and you find this ; "Executive function relates to abilities to differentiate among conflicting thoughts, determine good and bad, better and best, same and different, future consequences of current activities, prediction of outcomes and social "control" (the ability to suppress urges that, if

not suppressed, could lead to socially unacceptable outcomes).   I work in the field of substance abuse and study neurobiology to better understand the predicament my patients find themselves in.  Most of them became addicted before the age of 25 when the immaturity of their brain affected their choices. I hope you all can see that James too has an immature brain that was easily the victim of grooming by minds with malicious intentions . They took advantage of James trying to be the best Muslim he could without reading the language himself that would instruct him how to be a real Allah fearing man.  It seems to me from letters his parents have shared, his time spent incarcerated has helped bring him out of the "coma of influence" of those malicious posers. It seems to me it would be best if he got to come home to his family and friends with a court mandate to continue sessions with the cult breaking experts he has been making progress with already. If the purpose of incarceration is punishment and rehabilitation, I believe that time has been served and James needs to get back into the community so he might heal, make amends and allow his brain to mature.  I am asking you to take my observations of who James Bradley is and consider leniency in your sentencing.

Thank you very much for allowing me to share my viewpoint/ vantage point and knowledge with you.

Thank you for the work that you do.

Cindy Kue RPA-C, MPAS

Honorable Paul A. Engelmeyer
United States District Judge
Southern District of New York
40 Foley Square
New York, New York, 10007

Dear Your Honor,

      My name is Matthew Kue. I have known James and the Bradleys for a long time as we did Boy Scouts together, are family friends, and often hungout at his upstate bungalow. I currently go to the City College of New York.

      I have known James, aka Bucky, ever since I was 11 years old. I was the high aspiring newcomer and he was the golden Boy Scout. He had achieved the rank of **Star (two before Eagle) at the age of 13. Something that was unheard of before. Naturally, as a very competitive, youngest brother, I wanted to "beat" him. I wanted to get the rank of **Star before him. To do so, I went to all of the meetings and campouts and coincidentally, so did James. Every event I went to, so did he. We became fast friends, rooming for every campout from the age I was 12, to when I stopped going to campouts, around 16 years old. When he wasn't at a campout or meeting, it felt pointless to be there.

      There are 2 specific moments I remember most fondly of James that I believe show his true character. One summer at Boy Scout Camp, we did a merit badge called Wilderness Survival, which entailed sleeping on the ground with next to no tools- no lighters, fire starters, food, etc. We stayed up the entire night talking about our lives, looking up at the stars, and enjoying the true companionship we had with one another. Early in the morning, before the sun was up, our fire went out and since there were no dry sticks due to rain, we huddled with the other scouts. However, my body temperature drops significantly when I sleep so I was shivering and my teeth were chattering. James saw that, put his arm around me and tried to make me warm again. He even gave me his jacket for a while until another kid with an extra one gave me his. I know James froze during that time but wouldn't accept his jacket back.

      The second moment I think you all should know about was when he was first joining Islam. I was there during his entire transition up until the point he left for college. On campouts he would read me the Quran and say why he loved each section. One common theme I saw repeat was he loved the peace that he could attain both physically and mentally. Muslims believe in non-violence, no drugs, or alcohol, and loving each other for who they are. Knowing how tough he had it, living in the Bronx, surrounded by terrible "friendly" influences (I remember a distinct story of him getting jumped and beat for what I think was his Ferragamo belt, his favorite birthday present from his parents) it only seems natural that he wanted to feel safe and comforted. He adopted Islam for the security it gave him in his life. It was an excuse to get away from all the horrible influences he was surrounded by. The people that surrounded him with false muslim beliefs twisted his place of security into what they wanted. They manipulated and brainwashed him to create what they wanted only because he wants security so badly.

      Overall, James is still a kid. On our Colorado Mountains hiking trip he ate so much protein that he would have such foul smelling farts to the point where we demoted him from the line leader to the line caboose. He could never wake up to the call to prayer alarm he had going off very early in the morning. I would punch and slap him, but he still wouldn't wake up, asking for more time to sleep.

      I have never seen James without a smile on his face and a joke ready in his back pocket. He loves his family and friends more than anything. Every year at his family's Christmas party he would play the

trumpet with his band teacher even though he hated it, just so his parents could show him off to their friends. I know it has been a little while since I have seen him but he will always be one of my best friends. I wouldn't have been the same without him in my life and I hope he will re enter it very soon. I will always be there for him the same way he was there for me on my coldest days or on my very best days. The day he gets out of prison I will be there with open arms and an open heart.


Sincerely,
Matthew Kue



Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York

Re: United States v. Bradley, et al., 21 Cr. 277 (PAE)

Dear Judge Engelmayer,

My name is Daniel Konecky. My wife, Anastasia, and I live in Brooklyn, New York along with our two children, Isabella (almost 16 years old) and Desmond (9 years old). I am a freelance education consultant specializing in online learning. Before becoming a consultant I worked on education teams at the Obama Foundation, Teach For All and Relay Graduate School of Education. I joined Teach For America in 1998 and worked as a teacher in the New Orleans Public Schools system. I hold a M.A. Degree in Broadcast Journalism from the University of Southern California and a B.A. Degree from the University of California - Santa Cruz.

I met James Bradley (and his Mom and Dad) in 2012 when we bought a seasonal, very small vacation home in Spring Glen, New York (Ulster County). There are about 20 little bungalows on the property - ours was about 15 feet away from the Bradley's. Spending every summer at the colony, where kids drift in and out of the bungalows, meant that I got to know James pretty well. He was the oldest of all the bungalow kids. A true boy scout, he liked being the leader of the pack. Case in point - In 2014 when our homesick daughter was visiting her grandparents in San Francisco, James and his mom and dad were also in town… they volunteered to come over to the house to cheer her up, and help remind her that she's not alone. James was a terrific kid.

I got to know James more during the late summer of 2020. That's when our family sold the bungalow and bought a fixer upper in Delaware County. James had dropped out of school and was no longer playing the trumpet, or hanging out with friends… at least that I saw. What I saw was a bored kid sitting around watching YouTube videos… So with his parents' permission, I hired him to drive to Delaware County every day and help paint our new vacation home.

This was not an easy decision for us to make. James was clearly uncomfortable being in the house with our daughter. He was respectful to my wife but … just really awkward. The whole situation was strange. But he showed up every day. While working I tried to talk to James about… pretty much everything. Travel, music, philosophy, paths to returning to college. We had nice talks… I remember texting his Dad one day to tell him that James had actually asked a few questions about returning to college. His Dad and I were both crossing our fingers.

1

But for his part, James mostly just wanted to talk about the trade - about how fast his painting crew was down in the Bronx, about the nature of skim coating, about the craftsmanship of this paintbrush versus that paintbrush… He was proud of being a good painter. James constantly asked me to come upstairs to look at the progress he was making… We're talking 10-15 times a day. He was clearly seeking my approval of his work… and I think, by extension, of him... I believe that James wanted me to see him as his own man, and not as the bungalow errand boy.

James softened over those few weeks in September and October of 2020 - eventually he even hung out in the dining room with all of us and held a couple conversations with my wife. He was seeming a bit more like his old self… But when school finally started in New York City (it was delayed that year because of COVID), we wrapped up the work and our family drove back down to Brooklyn. Four months later, James was arrested…

I am obviously no psychologist, but I do believe that James Bradley knows right from wrong. In my mind, James has been searching for approval for a long time - especially approval from men.  I never felt that he was a danger to anyone around him. I trusted James to be in our home alone, to get a job done correctly, to be in close contact with my family.

Sir, I ask you to impose the lowest sentence permitted under the law. I ask that you give leniency to James so he can have a second chance at creating a real life for himself. James means a lot to me, and a lot to our whole family. I can't possibly speak to why he made these decisions, but I can say that I commit to being part of the healing process, and to being in his life when he comes home. In that respect, nothing has changed.

Sir, I also want you to know one last thing: When I joined Teach For America I went to a summer "boot camp" training in Houston This was in 1998.. One of my trainers was Jim Foley, who at that time was a TFA Corps Member from Phoenix, Arizona. He was an inspiration who I looked up to very much. Later on, like me, Jim became a journalist. But unlike me, he went abroad. In 2014 he was kidnapped in Syria and was killed by ISIS in a televised video. The day after he was murdered, a picture of Jim, on his knees in the desert, was on the front page of the NY Post. It was such an awful crime. I remember being at the neighborhood bodega, standing between my daughter and the display rack of newspapers - holding my breath so she wouldn't glance over and ask me about the man in the orange jumpsuit.

I'm sharing this detail because I want you to know that this isn't the easiest letter for me to write. There is a lot of darkness in our world. I am not naive. But Sir, in my heart of hearts I don't believe that James is part of that darkness. He was a good kid and he is a good man… a man who has confessed to his mistakes and deserves a second chance. I hope this letter helps shine a bit of light on why I believe that to be true and why I am asking for your leniency.

Thank you for your time.
Daniel Konecky

2

Honorable Paul A. Engelmayer                                      3 November 2022
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re: United States v. Bradley, et al., 21 Cr. 277 (PAE)

Dear Judge Engelmayer:

My name is Joe Shortell. I grew up in Stony Brook, New York, and currently live in the Bronx. I earned a bachelor's and master's degree, taught public school here in New York City, and currently work as a human resources consultant for a non-profit organization. I'm writing this letter of reference to provide information relevant to James Bradley's sentencing in February 2023.

My wife Trish (who passed away in late 2020) and I have been close friends of James Bradley's parents, Greg and Sandra, for 25 years. Sandra and Trish went through pregnancy together—Sandra expecting James; Trish expecting our oldest, JT. They delivered three weeks apart. Our families have spent countless occasions together through the years: apple picking, Mother's Day at Jones Beach, every Christmas Eve, etc. James calls me Uncle Joe. My three children refer to James's parents as Aunt Sandra and Uncle Greg.

As a boy, I knew James as exuberant, joyful, always smiling—and an utterly devoted friend. I remember taking James and my son JT to Van Cortlandt Park once. After hours of climbing trees and rocks, I called to them that it was time to go. As they walked across the main field, I saw James take JT's hand and they walked hand in hand to me. It remains an indelible picture of who James was as a boy.

As James grew older, I knew him as someone who works hard and gives himself to projects. On one Christmas eve, wanting to bring something to the occasion, James recited *Twas the Night Before Christmas* from memory. Another year, after taking up the trumpet, he played Christmas carols for us all—remarkably well, too! In sum, I know James as loving, connected, dedicated, and a source of positive energy.

I am appalled and heartbroken at the path James took that led to his arrest. I feel encouraged that he is working very hard (reading, exercising, soul searching) and has pleaded guilty honestly and unflinchingly. I'm sure James has more work to do, however, to permanently leave that false path behind. I can attest that James has a robust network waiting for him after his release who will support and expect continued work and development. His parents are totally committed to James. And they have the support of an extended family and particularly close circle of friends of which I am proud to be a member. In fact, after their move last November, the Bradleys are my neighbors, as James will be. I ask for the lowest sentence allowed under the law.

Sincerely,

Joe Shortell

November 1, 2022

Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re: United States v. Bradley, et al., 21 Cr. 277 (PAE)

Dear Judge Engelmayer,

My name is Brian Edwards, and I am writing to you on behalf of James Bradley in your deliberations for sentencing in the above referenced case.

In order to convey my unique and special relationship with James I would like to introduce myself.  I am 66 years old and a Partner and COO/CFO of TerraCRG, a commercial real estate brokerage company based in Brooklyn. I have resided most of my adult life on Manhattan's Upper East Side for the past 41 years. I came to New York from Minnesota at the age of 18, attended Columbia University and have made New York my home since then.  I am the son of a World War II combat engineer veteran – *The 1276th Fighting Mojacks* who fought from Normandy to the Rhine River between August of 1944 to May of 1945 and a mother who was a florist (both deceased).  I am married and have 3 children; my youngest is a senior at Duke University and is an Eagle Scout.   I have performed youth volunteer work most of my adult life; first as a coach of youth little league baseball, basketball and NYC Junior Road Runners Club for 12 years and then the past 10 years as a part of Boy Scouts of America (now called Scouting BSA).   I take my role as a father and husband very seriously and care deeply about this country as an American citizen.

I became involved in Troop 662 [Sponsoring Organization – The Brick Presbyterian Church, 64 East 92nd Street] in 2010 when my youngest joined the troop.  I held various roles until 2014 when I became an Assistant Scoutmaster and then, in 2016, became the Scoutmaster.  I held that role from March of 2016 until September of 2022 and during that time Troop 662 grew to become the largest troop in New York with over 70 Scouts for which I am both immensely grateful and proud.  It is through Scouting that I came to know James and his parents, Greg and Sandra Bradley.  It is through Scouting that I believe James nurtured a deep curiosity in people, culture and community.

Your honor, Scouting is not like any other youth organization I know.  Between a focus on community service, moral, ethical development and personal development, young men learn the value of teamwork, discipline and critical thinking. As the Scoutmaster, I got the opportunity, unlike a youth athletics coach or teacher, to develop close relationships over the course of years with those Scouts who reached the rank of Eagle Scout; a time frame typically 5 to 7 years.   Eagle Scout rank is Scouting's Phi Beta Kappa. It is the best of the best and requires a long-term mental and physical commitment of both the boy and his or her parents. It is in this environment that I built a unique and special relationship with James and James' parents.

James, of course, was not "James" when I first met him. James went by the name "Bucky", and he joined the Troop in May of 2012 right after his 11th birthday.  Bucky, as we would call him until he turned 15 years old and requested that we begin to call him James, was an adorable kid with an impish smile,

developed sense of humor and incredibly sincere. My first memory of him is encapsulated in this picture from his first Scout ski trip when he tried, not successfully, to learn the card game Hearts with his fellow Scouts who routinely challenged their Scoutmaster to a good-natured game of cards.



It would be on that same trip that I would watch, not without a little bit of horror, as he slipped off the ski run as a beginner snowboarder and head-on straight into a small tree. He recovered, of course, a little shaken and a small headache but eventually, years later while on his 4th ski trip he would be an expert snowboarder ensconced in the terrain park doing jumps in front of me and his father as I recorded it on my cell phone camera.  James could be singularly focused on something and determined to learn it, know it and then move on to the next thing was my impression.

James early years in Scouting were devoted to personal advancement as measured in rank elevation and personal intellectual development as measured in completion of "merit badges" which is Scouting's method of introducing young men to vocations, hobbies, and community awareness that traditional education systems rarely address.  James developed an interest in music; specifically, the trumpet providing a musical base that would eventually earn him a place in Fiorello H. LaGuardia High School of Music & Art and Performing Arts (know as the "Fame" high school) as rigorous a school as can be found in New York City.

In his mid-teen years, James was an exceptional Scout, rarely missing meetings and a readily reliable leader who developed both a love of the outdoors and a faithful following of adoring younger Scouts.  I experienced this firsthand on so many weekend campouts that James attended.  James had more than just *joie de vi·vre*, James had strength, moxy and a sense of camarderie.

James had the right stuff:








When James reached his later teens he committed himself to completion of his final rank to Eagle Scout and he proceeded to undertake the painting and renovation of 2 classrooms at The Isaacs Center, a community center in the middle of the the NYCHA Stanley Isaacs Houses.   Community service was always a part of James' Scouting experience and he successfully put his stamp on his own Eagle Scout Service project with determination, thouroughness and compassion.   He participated in many other Eagle Scouts' Service Projects as well, helping his peers reach the rank of Eagle Scout.   And James did not just participate to check boxes. When James threw himself into an activity he was committed and engaged:





During James final year with the troop in 2018/2019 he was selected as one of 7 Scouts who would make up a crew entitled to participate in a 2 high adventure events: white water rafting the Hudson Gorge and an 11 day wilderness trip and 14,000 foot ascent of Mt. Bierstadt in western Colorado.  As the head of the troop and lead adult advisor of high adventure crews I selected James due to his commitment to the ideals of Scouting, physical devlopment, and mental fortitude.  It was during the second high Adventure trek to Colorado that another of James innate personality traits was on display. Hiking above 10,000 feet for sea-level Scouts can be both physically and mentally stressful. One of the Scouts on our trek was not prepared to carry the 35-40 lb backpacks at 12,000 feet and James along with 2 other senior Scouts took it upon themselves to relieve that Scout of the weight and added it to their own weight. When that was done, James took on even more weight from his father- Greg's own pack.  This is how I remember the best of James: Unflappable, unselfish, and serious.



Your honor, I heard of James' conversion to Islam as a side comment by one of the Scouts in the summer of 2018 during our Troop Leader's white water rafting trip.   At first, I thought it was meant as some kind of a awkward joke that teenagers are inclined to throw at each other and I wasn't quite sure how to react.  During conversations with Greg it sounded more like an exploratory turn of interest that teenagers often venture into when they are questioning everything in their lives;  I know because I did at that age.  I had gotten much closer to James' father, Greg, during our frequent hikes as troop chaperones and advisors and we often spoke of James' need to find himself and our early conversations allowed us to arm-chair analyze what we thought James must have been going through at this age.  As time went by through that summer and into 2019, Greg and Sandra's concerns grew and I noticed a definite change in James though he still maintained a very consistent and dedicated approach to his Scouting and he pushed through with his Eagle Scout service project.   I knew he had become very serious about his conversion to Islam when we sat down for our final meeting which is known as a

Scoutmaster Conference prior to his final Eagle Board of Review (BoR) with 3 adults in 2019. It was evident in the way he described being uncomfortable being asked to recite the Pledge of Allegiance which he interpreted as running contrary to his new faith (the premise being that one could only pledge allegiance to Allah).  Since reciting the pledge is not a requirement for Eagle Scout it was not requested during his BoR and he passed the Board of Review.

That evening was the last time I saw James and I understand that the path he went down is completely foreign to how James was raised, the friends he surrounded himself as a teenager and my relationship with him.  James was radicalized to be sure; and he willl have to live with the consequences of that for the rest of his life.  But James' life has enormous potential for love, growth, and good. James' parents are two incredibly intelligent, deeply compassionate, and sincere adults who have been able to weather this trauma because of their deep love for James, for each other and for their close circle of friends and family who support them.  I have no doubt that James has the same right stuff inside that he had at 11 and at 14 and at 18.  That never goes away and I hope your Honor that you will know I mean this sincerely when I ask that you allow the village to take back James and help him re-build his life.

Yours sincerely,

Brian Edwards
Scoutmaster, Troop 662 (retired)
Eagle Scout Dad

Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re: United States v. Bradley et al 21 Cr. 277(PAE)

Dear Judge Engelmayer,

My name is Luis Sevilla. I am a 44 year old martial artist, husband and father. In April of 2022, my wife and I opened our own martial arts school together on the upper east side of Manhattan (EL DOJO NYC). I've spent about 28 years as a martial arts instructor, 17 of those years I had the privilege of teaching at a school on 86st. I've seen first-hand the effects that martial arts training has had on my student's confidence, respect and overall outlook on how they see life. For some, it is truly a transformative and meaningful experience.

My former student, James Bradley, has been accused of some terrible crimes. It is a challenge to write you this letter because of what may have happened had he committed these crimes. I am torn. At the same time, I feel it is my duty to inform the court of my experience with James Bradley through the past 10 -12 years. I wanted to share with you the person that our academy came to know and love.

During my time leading this school, we signed up James Bradley. He went by the name Bucky. Bucky was small and had a great sense of humor. Even at a young age, win, lose or draw, James showed an incredible aptitude for listening and following directions. You couldn't help but notice James's drive for wanting to stand out amongst his peers. He was great at making those around him more excited about training with his contagious attitude. Bucky was loved by his classmates and by all of his instructors early on because he could partner with anyone. He had great wit, sense of humor and a wisdom that wasn't common for kids his age.

Early on during my time training James I began counting on him to help lead classes because of his great technique and demeanor. James was diligent as a student. He would train 3-5 days a week. I could always count on him to be a great ambassador for our school. He was at his best when speaking to new parents coming to sign up their kids. He would explain that he himself was nervous during his first class. His empathetic way would ease the new students into class every time.  Parents were always so impressed by his maturity and confidence. I counted on James all the time

during those years. He was an incredible help. He is a student that definitely helped my success as a teacher and manager of this school.

It is common during the course of training a student that you get to know the parents that frequent the school. James' parents, Sandra and Greg, were always at the school. They attended all functions regularly and watched classes. They were so excited to see the progress that Bucky made. These are generous people that have given back to the community. During the pandemic, we had to shut the school down. Even in the midst of all the chaos, we had donations come in to help the school not close. Greg and Sandra were some of the parents that helped the school and for that and more these are amazing individuals.

As Bucky got older he was inquisitive about exploring life. He had questions about religion and who he was in general. I remember him coming to me one day and saying he wanted to study Islam with some friends. While I thought it was a bit odd. Bucky was always known to be open-minded. A true thinker. He is extremely intelligent and his instincts as a martial arts student and instructor through all these years were always exemplary and never made me question his actions. In his later teenage years I would invite Bucky in the Summer to come in and work with Summer Camp. Every day he worked and greeted the kids and the parents while he softly played the trumpet. Kids adored him. He was easy to work with and took directions perfectly. We literally would have kids sign up for the weeks these older students would come help out because of how much fun they'd have around him.

There were many instances where Bucky would sit and welcome timid students into the camp. He was always great at including everyone in the games. I would always see him walking to the end of the playground to grab that one camper that was feeling left out. When James was there I always felt that the campers were with someone who truly cared about them. I always asked him if he could stay and work for more weeks during summer but he said that he wanted to spend the Summer working as a carpenter's assistant so he had more skills to share. He always left our academy with a smile.

Judge, I would speak to him and text him regularly up until the pandemic. He always seemed like the same loving person I knew. I would ask questions about school work and overall life and he was always as he was, charismatic, inquisitive and extremely kind. It never appeared to me that he may be in crisis. I was so disappointed and let down to see what he is accused of doing. I understand with what he's accused of doing there could've been grave consequences.

Something must have happened to James for him to act this way. I don't know what, but this is not something I would have imagined would ever happen. Especially from the person I knew.

Judge, I would never waste your time if I didn't think my experience with him was worth taking into consideration for your judgment. This young man was a contributor of joy, happiness and enthusiasm to those around him for so long.

Thank you for your time.
L Sevilla

Honorable Paul A. Engelmeyer
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

**<u>Re: United States v. Bradley, et al. 21 Cr. 277 (PAE)</u>**

Dear Judge Engelmeyer,

I appreciate the opportunity to speak on behalf of James' character as my interactions with him consistently proved positive. My name is Alexander Layne and I am James' cousin. James is ten years younger than me and that distance was never felt as he was aways conducted himself in a mature manner and enjoyed conversations about complex ideas. I grew up outside of Baltimore and took multiple trips up I-95 to visit my aunt, uncle, and James.

One time while visiting my Aunt San, I asked James to show me around his neighborhood in the Bronx as we had a few hours until dinner. James replied that there were no places that he would want to take me as the area was unsafe. This caught me off guard as James was 17 and did not have any special place. Outside of Baltimore is Old Ellicott City and I would always take visiting friends and family on a walk through the charming and historic riverside town. It depressed me to know that James did not have a hidden gem getaway. James rarely spoke of friends and I took away from this particular trip an element of loneliness.

Towards the end of Highschool, I committed to stop lying to myself and to take every step forward with honesty and integrity. I chose to come out as homosexual to my friends and family. At the time I was unsure of how my extended family would react and prepared to bear the cost of loneliness as the price of honesty.

With James spending more time at the mosque and adopting the teachings of the Quran, I felt a concern was growing that he would not see me as a good person due to my sexuality. I have been exceedingly fortunate as no family member has disowned me because of who I love, and I was anxious that James would be the first. We had numerous discussions about the role of religion in a person's life and how the teachings of the Bible, Torah, and Quran can be a positive guiding influence for people who are in need of direction. The biggest question I wanted to ask James was "can you be good without God?". James affirmed that religion offers solid guard rails for a person's life and someone can be good without God. Following that discussion, James, his mother, father, and myself sat down for dinner. We broke bread together.

The news of James' situation floored me as this is not something I would have ever envisioned James would do. I feel that James' deep loneliness was capitalized by people who did not have James' best interests in mind. I look forward to a time when I can resume our deep conversations about life, the universe, and everything with James. His cousin misses him.

Sincerely,

Alexander Layne

October 8, 2022


Honorable Paul A. Engelmayer

United States District Judge

Southern District of New York

40 Foley Square

New York, New York 10007


Re: United States v. Bradley, et al., 21 Cr. 277 (PAE)


Dear Judge Engelmayer,

My name is Susan Sciford, writing on the behalf of my beloved nephew James V Bradley. I live in Maryland with my husband of 40 years, and am employed as a paralegal at an engineering firm negotiating a variety of contracts, a profession I enjoy a great deal.

I first met James a week after his birth, staying a week to help my sister and her husband establish a routine with their first child and only child. It was immensely rewarding to be able to provide such help, experience is a great teacher and I benefited from my mother providing the same sort of guidance to me.

As a young child James was and continues to be an inquisitive individual, gentle, kind and accepting of others. James grew up in a very loving home, practicing Catholics, in a calm and harmonious household. When visiting, James was always ready to invite us into their home, and especially happy to have us hang out in his bedroom where he shared stories of his activities at school, his favorite action figures and games that he enjoyed so much.

As a youth, James picked up Spanish on his own and spoke quite fluently, his interest in languages was always something we would talk about. While in an elevator or staircase in his building James would engage in a brief conversation with other tenants in Spanish and it was impressive and also a little intimidating as I took Spanish 4 years in high school and retained next to nothing.

James is and always has been very tolerant and accepting of others, even as a child. I used to wonder if it was in part due to being an only child, no one to argue with or team up with to conspire against the parents and grew to understand it was a gift he was blessed with. I always enjoyed our talks, James was always interested in learning more about whatever topic we were discussing and would remind me about it the next time.


What I want to share with you is James' desire to find a community that shared his interests and Islam, like every other religion, can be a safe harbor and touchstone for many throughout life. James was always religious, an alter boy and practicing Catholic.

I ask for leniency your honor, the James I know is not just the person you've read about in the news and in this proceeding. James, like all of us, is many things, an eagle scout, a Taekwondo assistant instructor, a kind and loving son - looking to find his place and in

my opinion due to his natural tendency to accept others. I believe James was targeted and mentally coerced into engaging in extreme Islamism by leaders older than himself and experienced in manipulating younger men with a desire to belong. Again, in my opinion, only children often look for the comradery of a friend group throughout life, something siblings and most people are blithely unaware of.

When considering sentencing, please impose the lowest appropriate sentence or the most lenient sentence permitted under law. Prior to James' introduction to Islam he was a model citizen who worked part time while over this summer and when not in school and was devoted to his parents. James has not hurt anyone but himself, and his parents and extended family. James wants to right his wrongs and is uniquely positioned to help others who find themselves in a similar situation, and unfortunately there will be others like James who will need his guidance in finding their way back. Experience is the best teacher and James' life experience is something he can turn into a positive in helping others if given the opportunity and you alone can help to facilitate that.

Kind regards,

Susan Sciford

Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Dear Judge Engelmayer,

It is sometimes difficult to understand events that manifest in our lives. My daughter, sixteen, was diagnosed with acute leukemia four years ago, and she had a bone marrow transplant last March to treat her relapsed disease. I ask why. I now ask why our friend, James Bradley, became involved in misguided religious fanaticism. I know both of these young people well, and I have no answers. I have only hope that both of them will be healed with the help of their families and medical professionals.

I was at the birth of James Bradley in New York, and Sandra Bradley attended the birth of my twins seven years later. These were beautiful, healthy babies who thrived in their childhoods. I know how much love and attention James received, and how he lead a life a positive intentions-he learned to play the trumpet, to camp with boy scouts and to gather a group of friendly teens around him in early high school. We attended the Bradly Holiday party at their apartment five years ago where James gave an impromptu concert for the guests and the kids gathered for video games in the study.  Things seemed totally normal and upbeat.

When Sandra told me of the events of James' life in the last two years, I was in shock. The sad thing about the internet is that it is a secret world where parents can only guess as to what type of information is presented to children. Parents know how vulnerable young people are to these influences. Kids believe the internet is reality. It is not. If I could change one thing about today's world it would be to remove the internet, cell phones and social media from kids' lives until they reach adulthood and can make better decisions about the use and value of these devices.

The one advantage I have in understanding the mind of adolescents in their late teens and early twenties is that I have taught them English Composition and Oral Communications for the last 2 decades at the college level, the last fifteen at Franklin Pierce University. Hearing their words in the classroom and in their essays gives me an entrance into their minds and hearts. The one thing I know is that these kids are searching for guidance and they want to do the right thing, have the right answer and learn what they think that I want them to think. This is the opposite of what I teach. If they can reach their own understanding of the issues and realize that there is no right answer, but only the looking for a answer or simply gaining more knowledge.

I understand that James is receiving therapy from specialists that will help him understand how he was manipulated and to find a way to clear his brain and see the truth. I put my faith in their wisdom and guidance.

Sincerely,
Brenna Manuel

December 22, 2022

Honorable Paul A. Engelmayer

United States District Judge

Southern District of New York

40 Foley Square

New York, New York 10007

      Re: United States v. Bradley et al 21 Cr. 277(PAE)

Dear Judge Engelmayer,

      My name is Carla Manning and I am writing on behalf of James Bradley.  I am a 62 year old married mother of 3 sons. I have an undergraduate degree in International Relations and a Masters' Degree in Mass Communications. I have had a few careers in my life including as a United States Foreign Service Officer and a television news producer/reporter. Currently I am a real estate investor in Charleston, SC.

      My involvement with the Bradley family began on my first day of high school in San Francisco when I met Sandi Sciford, now Sandra Bradley, James' mother. We became fast friends and she has been like a sister to me since then. We have been through all of our lives' events together: weddings, death of parents, sickness, trips and babies. I witnessed firsthand Sandra's multiyear struggle with infertility so James' birth was an especially joyous time and the Bradleys' family unit was one of love and happiness from the first day.

      James was a sweet baby and that sweetness stayed with him as he grew.  That always struck me since he was being raised in the big city. James always had an innocent quality about him where he only saw the best in people even as a little boy. The other quality that comes to mind when I think of James is his passion. When James was interested in something, he went "all-in". The support and encouragement of his parents gave him the confidence to try new things.  He took up Tae Kwan Do and became a Black Belt. He wanted to learn more about the Catholic faith he was raised in and became an altar boy and youth group leader. He got into skateboarding and I was regaled with all the specifics of tricks, different boards and wheels. He joined Cub Scouts and ended up as an Eagle Scout. James learned to play the trumpet and performed at Carnegie Hall and was accepted at the LaGuardia School of the Arts for high school.

      High school is a tough time for most but for James being in this big city, competitive environment was especially hard. He never felt like he fit in and his fellow students seemed

very "fast".  It is here that he was introduced to Islam and In James' fashion, he studied the Koran and went to the mosque every week. Sandra and Greg met with the Imam at the mosque to learn about the religion and how they could support James in something that was very foreign to them. James told me on numerous occasions that he wanted to learn Arabic to further study the Koran and the tenets of Islam made sense to him. The ritual aspect of daily prayer and attending the mosque gave him structure and peace during a chaotic time.

How did it come to the horrible events of March 31?  It really was like watching a car accident unfold. James left his safe cocoon and went off to college, an environment which seemed so "sinful" to him. He dropped out, returned home and then COVID hit. The lockdown and isolation really did a number on him. In sad irony, I remember San telling me on the phone that James said "another day in prison". For the first time in his life, James was hiding information from his parents. When quarantine was lifted, James started disappearing. Greg and Sandra hired a private investigator to find out where he was going and in a period of a few weeks, discovered he was going to a different mosque, was staying at a cheap motel and had met a girl. They were frantic but it was too late. All of James' inherent qualities, his young man's unformed brain as well as world events had led him to be radicalized.

Does this excuse his actions?  As someone who had to have 24 hour guards at my door during my time in the Foreign Service due to terrorists, and having witnessed the events of 9/11, the bombing of embassies and losing acquaintances in the wars in Iraq and Afghanistan, I'm sure that when reading the newspaper articles about James' arrest, I would have thought "Lock him up!". But in my heart I know that was not the real James Bradley. I have heard my "sister" sob cry every day for a year and seen the anguish in Greg's eyes. For over a year they have met with various therapists and experts in radicalization who have also met with James. Slowly the James I have known for all his life is emerging. I believe his guilty plea shows that he is not making excuses but rather taking responsibility for his actions. He has gone from a boy who did not want contact with his parents to a young man who has apologized for all the pain he has caused them. Judge Engelmayer, I believe this is the fork in the road. James Bradley is someone who is being rehabilitated and will continue on a path that will ultimately help others. I am not asking for leniency but rather acknowledgment that a long prison sentence would not be of benefit for any involved party, including the US government.


Sincerely,



Carla Manning

Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

**Re: United States v. Bradley, et al., 21 Cr. 277 (PAE)**

Dear Judge Engelmayer,

My name is Hector Castro and I have worked in IT Disaster Recovery for Business Continuity for over thirty years. My son, Peter Castro and I have been friends with James Bradley since kindergarten at St. Joseph's school – Yorkville. Your honor I write this letter to share with you my knowledge that James is a man of good character with admirable values.

Your honor, James's father, Greg Bradley and I constantly engaged in the development and strengthening of our sons' wellness health. I have fond memories of our sons' participating in sports such as baseball and martial arts. Watching them learn many good skills and qualities like work ethics, self-confidence and responsibility. I have seen James grow into an accomplished martial artist with patience, humility, persistence, respect, dependability and self-discipline. I have distinct memories of observing James instructing younger boys and girls with a compassionate caring and respectful warm attitude.

Your honor James, a person of good character can inspire young individuals to counter act his misguided notions made at an impressionable age. Knowing James as I do, I believe he is capable of understanding and correcting with proper guidance from the court and community from this experience.

Respectfully Yours,

Hector Luis Castro

October 25, 2022

Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

**Re: United States v. Bradley et al., 21 Cr. 277 (PAE)**

Dear Your Honor:

Please allow us to introduce ourselves. We are Jeffrey and Lynne Holmes. We are retired teachers who reside in the Albany area in New York State.  This letter is in support of James V. Bradley II, who recently pleaded guilty to one count of attempting to provide material support to a to a foreign terrorist organization.  James is our nephew. We have known him his entire life and can vouch for his character.  We are hoping you will be as lenient as permitted by law with his sentencing.

Our family has spent a lot of time with James and his tremendous parents, Greg and Sandra Bradley. We have three sons whose ages range from 28 to 25.  They consider James (or Bucky as he was known for the bulk of his life) as an honorary "little brother".  He was a joy to be around, full of life and a playful spirit. We enjoyed his company immensely.

Greg and Sandra provided James with a myriad of experiences in his young life.  He was exposed to religion, music, service, education, athletics, travel, and family.  He was educated in his younger years in a parochial school in Manhattan, a public school at Croton Harmon (where Greg is a noted and respected teacher), and finally at LaGuardia, which specialized in the arts.

James was always a very enthusiastic, loving, and spirited young man that valued family. Because of his enthusiasm and desire to be accepted, we feel he was targeted at a very young age by impressionable people.  This has contributed to the predicament he finds himself in presently.

James V. Bradley II is a very caring young man that has made a terrible mistake that he has completely taken responsibility for.  He loves his parents and his extended family.  Once again, your honor, we ask leniency from you in determining his sentence.


Respectfully,


Jeffrey Holmes
Lynne B. Holmes

Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square New York, New York 10007

Re: <u>United States v. Bradley, et al.</u>, 21 Cr. 277 (PAE)

Dear Judge Engelmayer,

My name is Jennifer Clements. I am 53 years old, a native Brooklynite, with a bachelor's degree in Speech Communication from SUNY Oneonta. I am a freelance Training Coordinator and I work with various production companies to help produce training workshops primarily for pharmaceutical companies.

In the spring of 2012, my family (husband John and daughter Sophia, 5 years old at the time) and I - along with some friends - rented a seasonal bungalow unit at Spring Glen Corners (SGC) up in Spring Glen, NY. It was there that I met James Bradley (9 or 10 years of age at the time, and he went by the nickname Bucky) and his parents Greg and Sandra. After two seasons of renting, our family ultimately bought shares in the cooperative community, and we have spent many weekends there throughout spring, summer and early fall each year in what I affectionately call My Happy Place.

I remember being so impressed by Bucky's intellect, quick wit, his easy going personality; he had the gift of the gab like many only children possess. He was always an active participant in pot luck parties, singalongs, and performances at SGC. He was so welcoming to us and always fun to be around; an integral part of our time at SGC. He has always been very close with his parents and we deeply love this family.

One of my favorite things about being up at SGC was that at dusk each night we could hear a bugle being played in the distance out in the field by Bucky. It was a soothing and beautiful ritual that I looked forward to each evening, and something that Bucky enjoyed doing; a kind service to our community. As he grew older, he gave up his nickname and we then all called him by his given name James. A proud Eagle Scout, James once jumped immediately into action to administer first aid to our daughter who had been stung by a bee at the pool. This is the James that I know. A kind person with a big heart who wants to do good and help others.

I've always seen James as a deep thinker with a thirst for knowledge and for excellence. I was shocked by the crimes he is accused of and pled guilty to, and I've had a multitude of emotions about it. I think that James found himself in a vulnerable time in his life and took a wrong turn in his seeking to find a deeper relationship with God on a personal level. We may never know every step that led him to where he is today but I know that James is a good man with a kind heart at his core, and he is taking responsibility for his actions. He is a lucky young man to have parents who have been working tirelessly to get him the help he needs on every level, and thankfully they have an excellent and dedicated support team. My sincere hope is that he will be reunited with his family, continue his education and move forward with his life in a positive way.

With all this in mind, I am writing to you, Your Honor, to ask for leniency for James. Please impose the lowest sentence permitted under law.

Respectfully,

Jennifer Clements

October 19, 2022

Honorable Paul A. Engelmayer

United States District Judge

Southern District of New York

40 Foley Square

New York, New York 10007

**<u>Re: United States v. Bradley, et al., 21 Cr. 277 (PAE)</u>**

Dear Judge Engelmayer,

We are Joseph and Elizabeth Merriam, both NYS certified teachers (although Elizabeth stopped teaching twenty years ago to raise our children). We know James Bradley because Joe has taught with James's father Greg at Croton-Harmon High School, and we became friends with the Bradley family. They have often invited us to their bungalow in upstate New York with our three children, Lawrence (19), Lily (17), and Paul (14). As someone who is slightly older than our children, James has always been something of an older sibling to our kids. This is the kind of person James is: at the bungalow, there's a swimming pool, and when our youngest, Paul, was six years old and couldn't swim, James would always hang out with him in the shallow end despite their age difference, playing with him and helping him to feel included with the bigger kids. This is the kind of person we still believe James to be today.

Our children have always looked up to James, and when our two families attended Sunday Mass at St. Joseph's Church in Wurtsboro, NY, James was an altar server. Our children admired that, and two of the three of them have gone on to imitate him in that regard. As James grew into a teenager, we saw a young boy who was seeking answers, seeking to belong, questioning who he was. For example, there was a time when he identified strongly with his part-Panamanian ancestry, diligently studying Spanish and trying to develop his tan. When he was at LaGuardia High School of Music & Art and Performing Arts, he identified with the musicians; in the Boy Scouts, he worked his way up to Eagle Scout. James was always trying to find his people, always seeking a place to belong; he tested out a lot of coats. But he never lost his urge to help people, as shown when he wrote our son Paul from prison with plenty of advice on how best to manage his Eagle Scout project. James has always had a warm, giving heart; he was just looking for a place to plant it. When he fell prey to radicalized Islamic beliefs, it seemed to us another instance of James trying to belong, only this time he trusted the wrong people and there were serious consequences.

We believe James would benefit from leniency because of his familial support and the support of his friends (including ourselves), but primarily because of the work he has done with Parents for Peace since his arrest to figure out where he went wrong and how he can make it right again. His willingness to return to college and study to become a counselor combined with his

giving heart mark him as someone who is ready to serve society, not endanger it.  Although technically an adult, he is still young, with a great deal of potential for good, and we hope he will have the chance to live out that potential.

Sincerely yours,

Joseph & Elizabeth Merriam

Kristin Noel Schoenleber-Fontan



Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

November 21, 2022

Re: <u>The United States v Bradley, et al.</u>, 21 Cr.277 (PAE)

Dear Judge Engelmayer,

By way of introduction, I have worked as a secondary English teacher for the last 28 years – 21 of them at Croton-Harmon High School.  I have a Bachelor's degree in English from the College of William and Mary, a graduate teaching credential from Mills College in Oakland, CA, and a Master's in Education from Mercy College.  I first met James Bradley (or "Bucky," as he was called then) in 2005, when he was around 4 years-old.  His father Greg and I are colleagues at Croton-Harmon HS, and when we realized that we lived 10 minutes from one another in upper Manhattan, we often carpooled together, so we'd pick James up from daycare on our way home. James was a friendly and enthusiastic child, and I enjoyed being part of the daily reunion between him and his dad.

I became more closely acquainted with James when he moved with his parents to the home they purchased on Walton Avenue in the Bronx, which was also about 10 minutes from my apartment in Harlem. James started to attend middle school in Croton, so he rode along with us, and he always made the day brighter with his gregarious chatter.  Sometimes Greg had theater rehearsals after school, so I'd drive James home to his mother Sandra on my own, and we had fun conversations along the way.  I had a Mini Cooper, and we both got a kick out of riding in it. James' curiosity impressed me; he made observations about the instrument panels and asked questions about the car's petrol consumption, and we'd laugh about how she was so fancy that she only drank "Champagne" (high-octane fuel). As he reached seventh and eighth grade, James was also interested in practicing Spanish with me, as he was studying it in school, using it in his neighborhood, and his mother is of Panamanian heritage. (I grew up partly in Madrid.) I appreciated his warmth, his cleverness, and his interest in the world beyond his own experience.

I would see James occasionally at his parents' gatherings at their home in his early high school years, when he'd play holiday tunes on his trumpet.  I was sad and concerned when Greg shared that James was shutting him and Sandra out after James' conversion to Islam, and I was devastated when I learned that he had become involved in a purported plot to join ISIS.  Your Honor, my appeal to you for leniency on his behalf is not meant to minimize the seriousness of what he did, but to honor the genial and inquisitive person I know him to be.

Respectfully,

Kristin Noel Schoenleber-Fontan

Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re: <u>United States v. Bradley, et al.</u>, 21 Cr. 277 (PAE)

Dear Judge Engelmayer,

My name is Kym Timpano-Garrett and I have been a math teacher in the Croton Harmon school district for 27 years. I am writing to you on behalf of James Bradley, in the hopes that you find it in your heart to be as lenient as possible when deciding on his sentence.

I was James' seventh grade math teacher back in 2013/2014. James came to our middle school as a new student that year and immediately made many friends. This is no small accomplishment in a tiny district like Croton since most of our student population grow up together beginning in kindergarten. James' kindness and compassion toward others are qualities that most definitely drew his peers toward him. Back when I was his teacher I would always describe James as a student who loves life.

Every morning when James came to school he would spend a few minutes outside skateboarding with his friends before coming into the building. He would always greet me with an enthusiastic "good morning, Ms. Timpano" and a great big smile, which literally lit up the room. I have nothing but fond memories of the young boy who spent that school year with me. James was always willing to help a friend, participate in class, stay after school to get extra help or simply just to chat while waiting for his dad to pick him up and drive him home. We often spoke about baseball and our shared love of the NY Yankees.

Most students don't bother to acknowledge their previous teachers when they move on to higher grades. Not James; he has greeted me as if he were genuinely happy to see me each and every time we have run into each other ever since seventh grade.

The James Bradley that I got to know and think so highly of is not the same person that sits in that cell. Deep down to his core, he is genuinely a good soul and a wonderful human being. He was raised by good, loving parents who taught him morals and values and work ethic. I truly believe that James feels remorse for his actions and for causing his family such pain and distress. I have been keeping James and his family in my prayers since this nightmare began and I humbly ask that you allow him to join his mom and dad again and begin healing in the arms of those who love him most.

With sincere thanks and gratitude,

Kym Timpano-Garrett

6 November 2022

Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Dear Judge Engelmayer

My name is Meg Gardinier and I am a first cousin to Greg Bradley, whose son is James Bradley. Our family has been very close with my cousin Greg, his wife Sandra, and their son, James, for decades. Growing up, I was extremely close with Greg, his four siblings, and with his parents, both of whom are now deceased. I am currently the Secretary General of a global children's organization and reside in New Rochelle, NY with my husband, Thomas Lawder, a senior executive in the finance industry. We have three adult daughters, Meredith, Melanie, and Madeline, who live in Brooklyn, NY; Milwaukee, WI; and Oakland, CA, respectively. During their formative years, our family frequently celebrated a range of family events with James with whom we had an excellent and warm relationship.

As a family, we are shocked and saddened by James's recent adoption of extremist beliefs. We have had several thoughtful discussions about what transpired in James's life and are greatly concerned about his health and well-being. In looking back at the many years we have known James, we remember him as a caring, introspective, creative, and talented young man. Which is why we strongly believe his values were distorted by and manipulated by a sophisticated group of extremists, over many years.

We have so many memories as a family of the kind and gentle and playful person we know James to be. We hosted his family after he made his first Holy Communion at St Joseph's Parish in New York City, where he also attended elementary school. I recall how earnest he was at the time and so well mannered – deeply respectful of his elders and his cousins. My daughters remember his silliness and showmanship at holidays, cracking jokes and commanding the laughter in the room. When he was in high school, I had the pleasure of attending a concert where he played the trumpet at the LaGuardia School of Music and was deeply impressed by his mastery of the instrument, his discipline, and dedication to music at a young age.

James's parents — and our extended family in general — share a deep commitment to pursuing an ethical and compassionate life. When we first learned that James made the decision to convert to Islam (while he was in high school), our family was very accepting. We were struck by how observant he was and how steadfastly he adhered to all of the rituals and practices of his newfound belief system. During a Christmas visit, I asked him how he came to make the decision to convert to Islam and he said he had been approached through a video. At the time, I did not question this, although I later realized I should have raised more questions. For decades, I have been very involved in interfaith issues – having served on the Board of a U.S. based entity that promotes interfaith cooperation and having worked at a global network dedicated to fostering positive relations amongst children of different faiths. One of the things that increasingly concerned me, as James became more involved with Islam, was that he became more rigid and less tolerant of others. This did not resonate with any of the central teachings espoused by the many Muslim religious leaders I have worked with over the years.

In an increasingly complex world, James's search for meaning and identity led him to a new religion — and it has become painfully evident that James's honest quest for a new religious identity was thwarted by the tactics of a global terrorist organization actively recruiting young people, especially men, at a most vulnerable period of their lives. I have heard of many such accounts in my work. In addition, perhaps because of our family's values — our dedication to nonviolence, tolerance, inclusion, justice, community — we thought ourselves immune to the manipulation of extremist actors. As my daughters note, we did not look closely enough; we wish we had checked in on him more, guided him more, and had been more attentive to what he was going through. As a family, we aim to do it in full now, especially because we know, if given the chance, he could prevent many other young men from following in his footsteps.

At the same time, there are two additional issues at play. The first is the impact of neuroscience on the decision-making abilities of young people. You may be familiar with the recent US Supreme decisions affecting the sentencing of juveniles and adults who offend as juveniles. The case with which I am the most familiar is *Roper v. Simmons*, 543 U.S. 551 (2005). In this case, the Supreme Court held that the eighth Amendment prohibit the death penalty for offenders under 18. The decision reflected advances in neuroscience about incomplete brain development in juveniles. The Court cited three relevant ways that adolescents differ from adults: lack of maturity, increased impulsivity, and limited judgment; increased vulnerability and susceptibility to external pressure and negative influences; and a personality structure that is less fixed and more open to change. For more information, please see: https://jaapl.org/content/45/1/107#:~:text=In%20the%20first%20case%20of,incomplete%20brain%20development%20in%20juveniles. While James is slightly older than 18 when charged, it would be fair to point out that these recent advancements in understanding the role of neuroscience in late adolescence could be a strong contributing  factor in this case.

The second issue is the role mental illness has undoubtedly played in James's radicalization. We are painfully aware of the rising incidence of unmet mental health needs in our society and in particular with young people. In fact, we have experienced this in our own immediate family and extended family. While I am not qualified to comment on James particular mental health status, I would not be surprised if he, like many others in our own family and the broader community, has had his struggles.  We know that the current need for mental health services far exceeds the capacity to provide them and often it is too late before we realize how seriously an individual has been affected. In this regard, what James requires is a robust mental health evaluation to assess the relationship between his mental health and his recent experiences with radicalization.

For these reasons, it is respectfully requested that the court consider these facts, along with the other points made in this letter, and impose the lowest appropriate sentence or the most lenient sentence permitted under law for James Bradley.

Meg Gardinier Lawder



Pierre Van Cortlandt Middle School
3 Glen Place
Croton-On-Hudson, New York 10520

Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

September 29th, 2022

Dear Judge Engelmayer,

I am writing on behalf of James Bradley, a former student of mine. From what I understand James is facing serious charges for attempting to join a foreign terrorist organization and has been incarcerated for many months. I was surprised to learn of this development. I have known James for over a decade. The James that I know is a caring and compassionate person and someone who would never hurt anyone.

As a student at the middle school in which I am principal, James was one of the best students that I encountered. James' academics were second to none and he was one of the most respectful and well behaved students. James demonstrated good citizenship as a student and he was revered by teachers and his peers. It was troubling to learn that James had gotten into serious trouble and was facing a life altering experience in possibly being sent to prison.

While I cannot speak to specifics of the crime(s) that James is being charged with, I can speak about his character and his ability to learn from past mistakes. Just like any other middle-schooler, James made a few mistakes when he was a student. Once made aware of his shortcomings, James played an active role in ensuring that he took ownership, responsibility and that he righted any wrong he committed.

I am hoping that you extend the opportunity to James to do that in this case. James has already spent considerable time in jail. I am confident that James understands the seriousness of his mistakes, will learn from them and will make every effort to address the harm he has caused others. I ask that you seriously consider leniency in your sentencing and offer James the opportunity to learn from this terrible situation and build a meaningful life for himself; a life that will certainly have a beneficial impact on others and our society as a whole.

I thank you for reading this letter and considering the future of James Bradley as you handle his case and his sentencing.

Sincerely,

Michael Plotkin
Principal of Pierre Van Cortlandt Middle School

Honorable Paul A. Engelmayer

United States District Judge

Southern District of New York

40 Foley Square

New York, New York 10007

**Re: United States v. Bradley, et al., 21 Cr. 277 (PAE)**

Dear Judge Engelmayer,

My name is Morgan Layne, and I am a first cousin of James Bradley. I am a software sales account executive at Yardi Systems and have been with the company since 2017. My responsibilities include executing full sales cycles; pricing, packaging, and positioning; contract negotiating, and closing. But really, I meet with customers to develop relationships and hopefully forge new or continue to build existing partnerships for many years to come.

I am writing this letter given my dear cousin, James. I want to bring to light the kind of person that he is despite the grave allegations that he has faced in recent time. I have known him my entire life as I am 10 years older than him. Growing up, James was a cheerful, happy, and enthusiastic kid. I recall his playful and fun demeanor at family dinners, holidays, and weddings. He loved to sing and dance and play his trumpet! Throughout his time in boy scouts, he positively contributed to many good works in society and achieved the highest rank of becoming an Engle Scout.

Unfortunately, during his later adolescent years, he struggled to find his own path and became a target of manipulation. He made some very poor choices guided by a group of older adults with malicious intent. For many young adults, the transition period between childhood and adulthood is difficult and the pandemic only made this period of his life worse. I strongly believe James did not fully comprehend the seriousness of what he was saying or doing during the darkest period of his life.

As a family, we have united to support my lost cousin in his long journey to recovery. We will never give up on him as he works to find his own inner love and peace. I hope you consider this character reference letter before passing any judgement. Please grant him leniency as James will strive to make amends. Thank you for your thoughtful consideration.

Sincerely,

Morgan Layne

Dear Judge Engelmayer,

We are Sally and Michael Seymour of Leonia New Jersey.  We have known James Bradley for twenty years, his entire life, because we have shared a house in a seasonal cooperative bungalow colony with his parents, Sandra and Gregory Bradly, for all that time. Michael is a retired math and physics teacher, and Sally is a retired nurse.

There was not a season that we did not spend time and participate in activities with James and his family between 2001 and 2020.  We also were together at their Christmas gatherings and our birthday parties.  Before he was an older teenager he would always hug us when whenever we saw him.

Through these years (2001 until about 2020) we knew James to be a delightful child and teenager.  Things clearly changed around 2018-2020, as he became an older teenager and became more serious. We were not surprised…we have two adult sons of our own, and we remember the older teenage years to be challenging in their lives.

When James was younger we would spend hours playing at our community pool, talking around a campfire and enjoying time in the country.  He was genuinely pleasant and delightful with us and with children and teenagers who were there. We have sweet memories of watching James as a younger teenager teaching the children how to make s'mores. Our community did work projects together (cleaning out a garage, painting our pool, planting), and James always participated gladly.  He was happy to be helpful in any way we needed.

For several years he would walk to the center of our colony between 9 and 10 PM to play "TAPS" to everyone's delight.  There were a few nights that he didn't.  When I (Sally) told James I could not fall asleep without hearing him play "TAPS" he gladly resumed.

We were so glad when James was accepted into LaGuardia High School.  We watched as he became and Eagle Scout, and an apprentice to our local friend and contractor during the summer.  He gained skills in carpentry, construction and painting.  We saw the skills he was acquiring, and when he was 18 and 19 years old we hired him to do several projects (painting and repair) in our house.  He did these projects very well and responsibly.

We were heartbroken when we heard the news of his arrest.  We were aware of his interest in Islam, but the negative aspect and his arrest were not consistent with the personality that we knew James to have his entire life until those last months. We ask that you consider leniency in sentencing James, because the latest developments in his very young life, when he was still in his teenage years, are inconsistent with the James we have known for all the rest of his life. We hear from Sandra and Greg that he is coming to grips with what he has done and who he is.

Sally and Michael Seymour

Honorable Paul A Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Dear Judge Engelmayer,

Thank you for taking the time to read this letter. My name is Sara Langbert. I am a retired computer programming manager from Bloomberg LP.  Together, my husband and I have 5 children and 5 grandchildren. We live in Croton on Hudson where James Bradley's dad is a much loved and respected math teacher.

My youngest two children are boy/girl twins who went to Middle School with James Bradley.  He traveled with his father from Manhattan to attend Pierre Van Cortland Middle School. James was well liked. My children and I got to know James very well through a shared interest in music, sports and various school activities. My son always enjoyed James because of his gentle demeanor and intelligence. When they did science experiments together, he was always interested and engaged. When playing basketball, James was always a good team player. He passed when he should and cheered for his team.

All 3 of my kids played music and participated in All County orchestras. When the rehearsals were early on the weekends James would sometimes stay over at our house so they could all go together. Thus, he wouldn't have to travel from Manhattan. I remember making James his favorite dinner one night, (enchiladas) and his outward joy at the fact that I'd made HIS favorite. He complimented me on 'getting it right'. He was polite and always followed my instructions.

Another day that comes to mind was when we went to visit James and his family at their weekend home. There was a large crowd and many children. James was so happy to have so many friends present, and he was especially proud to lead them all, safely, on a hike in the woods. My daughter was away at camp and when her brother bragged about that moment of independence, she was so sorry to have missed the day. She used to tell everyone James was her boyfriend. James never had the heart to tell her he wasn't interested.

When James was arrested for his crime, we, and our whole neighborhood, were shocked and horrified. This was not the sweet, slightly eccentric and very creative child we knew. While aware that he was searching for answers, no one could have imagined that he would have been waylaid like this.  Many of his generation are struggling, but none of us expected this.  I found it very difficult, because a very close family friend was studying at West Point at that time. His threats to West Point hit home but also broke our hearts. This is not the person we know.

I hope this sheds a little light on who James Bradley truly is, and helps you to give him leniency when sentencing. I think with the right psychological help, James can become a fully productive member of our society.

Sincerely,

Sara Langbert

Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

September 27, 2022

Dear Judge Engelmayer,

This is a letter of recommendation for James Bradley. I have known James since he was an infant. James and his parents, Sandra and Greg Bradley, and I have lived in the same bungalow colony in the Catskill Mountains of New York State for more than two decades during the spring, summer and fall months. As an educator for 42 years primarily in the New York City Department of Education, I have known many, many children and young adults. James, however, is truly unique.

In fact, this is the second letter of recommendation I have written for James Bradley. The first one was in 2019 when James was applying for Eagle Scout. In it I wrote that James embodied the twelve values of scouting; that he is trustworthy, loyal, helpful, friendly, courteous, kind, cheerful, thrifty, brave, clean and reverent. I went further to include industrious, life-long learner and empathetic. Allow me to elaborate.

During the summer when most children and young adults spend vacations playing games or hanging out with peers, James worked side by side with a local carpenter as an apprentice. One project was building a deck that involved digging by hand deep holes into which supporting beams would be cemented. In the heat of July James stuck with this arduous task for several days never complaining or quitting. Too, he learned to read and understand blueprints and use a variety of hand tools. Another job was painting and staining my screened-in porch. He did an excellent job with the right equipment and I often think of him as I sit in it during a hot summer day.

When an older member of our bungalow colony, Sophie, passed away, James was quite affected as she had babysat him and was like a grandmother to him. James spoke at Sophie's funeral service in front of a roomful of adults. This was well before he was a teenager. Several years later, one of the children at the colony was bitten by a bee and crying hysterically. James used his boy scout knowledge to make a salve with ingredients from the kitchen which eased the pain and calmed the child. To say that he is liked, no, adored, by everyone in the bungalow colony is not an exaggeration.

I recommended James without hesitation then for the honor of Eagle Scout. I have not changed my feeling or opinion about him. I understand that he has gone through an ordeal the likes of which I can't imagine. I also know that he has plead guilty and has taken responsibility for his actions. I ask you, your honor, to please be lenient and merciful and consider his many months in jail as time served. Please

release James Bradley to those who love him and care for his wellbeing and future, for he is truly a unique young man.


Respectfully,


Steven Boyer



Nancy Francomano

████  ████  ████ ─┤

████████████████████ 12483

████████████████

October 2, 2022

Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, New York, 10007
Re: United States v. Bradley, et al., cr. 277
(PAE)

Dear Judge Engelmayer
    My name is Nancy Francomano. I
am a retired, New York City, special
education teacher. I was blessed to be able
to teach, 34 years, touching and being touched by many lives.
    I met James Bradley when he was
approximately 3 years old. He, and his parents
Greg and Sandra, have been a special part
of life since then. My parents were
James' "surrogate" Grandparents,
spending a lot of time together.
After my Dad passed, in 2006, James
and my Mom's bond grew even
stronger. He spoke lovingly, and

from the heart, at her funeral. He also served as a pall bearer.

As I watched James grow up I felt pride in the way he was ALWAYS so respectful, loving, warm, kind and compassionate. He truly showed a maturity beyond his years.

I recall James' years as a proud Scout and his strong passion for music. I remember him playing at Carnegie Hall, reserving a ticket for my Mom. We were all so proud of his many accomplishments and who he was.

What happened to James was a total transformation from what he was and what he truly is. Sadly, in searching for a sense of belonging with his peers, especially as he prepared for College life, he followed a path I know, he now, truly regrets.

Fortunately, James has accepted responsibility for that wrong path. Hopefully, in time, James will be able to help others in a positive, healthy way.

Sincerely,

Nancy Francomano

October 30, 2022


Honorable Paul A. Englemayer
United States District Judge
Southern District of New York
New York, New York 10007


**Re: United States v. Bradley, et. All, 21 Cr. 277 (PAE)**


Dear Your Honor,

I have known James Bradley and his parents, Sandra and Greg, since James' birth in 2001.  I worked with Sandra from 1995 when she joined the staff of the American Council of Learned Societies, a federation of scholarly organizations.  I was a program officer and Sandra soon became my assistant, continuing in that role when I became the organization's vice president in 1999. As a child and youth, James was a regular visitor to our Manhattan offices, and Sandra kept me informed of his growth, education, and interests.   I retired from the Council in 2018, but Sandra and I have remained in close touch since, including during the period of James' radicalization, crime, arrest, and incarceration.

James was a cheerful and charming presence.  He was very courteous and respectful. I was always delighted to see him and to respond to his curiosity about the keepsakes I kept in my office. The Bradley family was a close one, nested in a wide network of friends and relatives of both parents.  The Bradleys attended Mass regularly, and James became an altar boy.  He was a talented musician, pleased to be accepted at LaGuardia High School of Music & Art and Performing Arts.  James's other pursuits included skateboarding and exploring his Panamanian heritage.

As James finished high school, however, a shadow fell across his peaceful and wholesome development. His exploration and eventual conversion to Islam may have emerged from the familiar late adolescent search for distinctiveness and moral certainty, but his new companions encouraged him to withdraw from his education, music, and even from his loving family.  An enveloping isolation focused him on the radicalized internet, which help light the fuse that led to his serious crime.  I was glad to learn that in his court admission he acknowledged the wrong of the dangerous course he had undertaken.
I fervently hope that James can go forward from that understanding of his errors and become a healthy and productive adult. I know that his parents, their friends and families, will not stint in supporting James

on that journey. His repentance must be reinforced by the consequences of his actions, many of which he has experienced already.  I am confident that James can and will become a constructive, contributing citizen. I ask that you weigh imposing the most lenient appropriate sentence, one that will be both just and merciful.

Thank you for your consideration of this case.

Sincerely,


Steven C. Wheatley, Ph.D.

November 4, 2022

Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

**Re: United States vs. Bradley, et al., 21 Cr. 277 (PAE)**

Dear Judge Engelmayer,

I have known the Bradley family, Greg, Sandra and James, since 2002.  My family and the Bradleys are members of the Spring Glen Bungalow Summer Community located in Spring Glen, NY.  I have known and interacted with James since he was a young child.

James was always a great favorite in our community – engaging, curious and playful.  Although he was six years younger than my son Dylan, they found opportunities to play together from swimming in the pool to cavorting on the great lawn.  As James grew, so did his pursuits and interests.  With his family's encouragement, he became an altar boy, an Eagle Scout and trumpet player.  A summer evening in the glen was not complete without James playing "Taps" at dusk.

As James began his high school years, however, I was saddened to learn that he had had trouble transitioning from a small suburban middle school to a large NYC high school.  Like many adolescents, James was trying on new identities in order to find a place for himself in his new school.  First, he began to socialize with a group of Black teenagers and appropriated their style of dress and language. When that didn't work out, he became passionate about his Panamanian heritage, studying Spanish, and fixating upon the country's traditions and customs.  Eventually, he found himself so drawn to and fascinated by Islam that he converted to it.  Tragically, James was preyed upon by Islamic extremists who effectively brainwashed and transformed him into a pawn for their own malicious intents.

I am not a psychiatrist, but I am an educator who understands how children develop and grow. It seems clear to me that James is suffering from a mental health disorder revolving around identity.  James does not belong in prison. Instead, he needs to be surrounded by a supportive community that includes family and  friends as well as the Parents for Peace advocates and mental health professionals who can treat his underlying mental illness. With the proper care and guidance, James will once again contribute positively to society.

Sincerely,


Sandra Galeota-Long
Staff Developer, K-2
PS 8, Emily Warren Roebling School

Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re: United States v. Bradley et al 21 Cr. 277(PAE)

Dear Judge Engelmayer,


Dear Your Honor,

I am writing on behalf of James Bradley, a young man whom I have been delighted to know all of his life.

My name is Yvonne MacNeely, I am 61 and I live in the farmlands of Washington State. Sandra Bradley (James' mother) and I met in Manhattan as theater students. We became fast friends and soon roommates for a few years. Greg Bradley (James' father) met Sandra during that time and we have been close personal friends ever since. Despite my move to San Diego, we attended each other's weddings, and our sons were born three months apart.

The Bradleys and our family visited each other throughout the years; in San Diego, New York and also in San Francisco, when the Bradleys we're visiting family. Our three children were always  excited to see James, who was always a pleasure to be around. Despite several years between visits, James instantly welcomed my children into his company like old friends; smiling, laughing, inviting them to play or run around outside. I recall being very impressed at how fun-loving, open and witty he was at a very young age.

When our boys were six, I took my son, Judah, to visit the Bradleys and looked after James during his spring break. James and Judah instantly appeared like the very best of friends. James especially loved the Museum of Natural History and enthusiastically led Judah to his favorite exhibits. All week, James never once complained, disagreed or clashed with Judah. No matter what we did, ate or how tired we were, James continued to laugh, joke and engage my son.

In 2014, the Bradleys visited us in San Diego to attend Judah's bar mitzvah. James was the life of the party at the reception, but he was also completely taken with the ceremony; Judah reading in Hebrew, the traditions and celebration. When we got home, James told me he was interested in becoming Jewish. He grinned and said he wanted to have a bar mitzvah and that it was all so cool. He asked a myriad of questions, so

with Sandra's permission, I sent him a book called, "What Is A Jew?" I never heard anything more from James about Judaism after that.

2017 in New York was the last time I saw James. He had become a Muslim, but didn't really share about it with me. We visited briefly, and James was still as charming and funny as ever.

When I heard James had been arrested for attempting to illegally leave the country, I was in complete shock. It seemed unfathomable, that such a joyful, affectionate and open hearted young man would try to break the law. Of all the young men I know, James was the last one I would have guessed to attempt involvement with terrorists.

While James has been detained, we have exchanged a few letters. James' letters are long and thoughtful; mentioning a fond memory with every member of my family. Through COVID, being confined to his cell and showering in the sink, James' letters are still upbeat and cheerful; describing ten months of lockdown confinement as, "... honestly not as bad as it sounds. You get used to it after a while.."

I'd like to conclude with a few more quotes from James' letters written in January and February 2022. I think they speak to the sweet and empathetic nature of this precious young man.

"Ms. MacNeely, all of my mom's friends treated me like their sons, thank you for your kind treatment my entire life."

"I'm doing just fine, thank you all for asking about me and writing me."

"This is going to sound so crazy, but all of my bunkies/cellies in the federal prison here have been better than my college roommates. More polite, courteous, respectful, cooperative, everything!"

"I did have a pretty bad hiccup in my previous jail. I got kind of depressed and I stopped working out for like a month and a half. A couple guys came up to me and really were genuinely concerned and motivated me to start working out again. The endorphin released from exercise really can bring you out of a negative emotional place."

"There is an Infinite Wisdom behind why God is putting me through this tribulation. I understand that and I strive to use this time for reflection and to turn to him in devotion."

James Bradley, in my experience, is extremely kind-hearted and sensitive. I believe his innocent nature and enthusiastic penchant for embracing whatever life presents him, has led him to trust in the wrong people. It is my belief that James' prime motive was based on a misguided desire to help people who are suffering.

I humbly thank you, Your Honor, for your time.

Sincerely,

Yvonne MacNeely

# Exhibit C

*(psychological evaluation by Dr. Akinsulure-Smith)*

**FILED UNDER SEAL**

# Exhibit D

*(report by Parents For Peace)*

**FILED UNDER SEAL**

# Exhibit E

*(BOP programming certificates)*



# COLUMBIA UNIVERSITY
## IN THE CITY OF NEW YORK

*This Certifies That*

# James Bradley

*has successfully completed a Mini-course in Cryptocodes offered by the*

*Justice-in-Education Initiative and the Rethinking Justice Initiative and in testimony thereof is awarded this*

# Certificate of Completion

*Conferred in the City of New York on this*

*Fifth day of August in the year Two Thousand Twenty-Two.*

_____
*Instructor*

_____
*Instructor*



# MDC Brooklyn
# Recreation Department

This is to certify that

## James Bradley

Has Successfully Completed

## Sentry Diabetes and You Journal Course

At MDC Brooklyn

This certificate is hereby granted this 23rd day of June 2022

**D. Ranalli**

Recreation Specialist

# Certificate of Completion

Metropolitan Detention Center- Brooklyn

Brooklyn, New York

THIS CERTIFIES THAT

## JAMES BRADLEY

*has satisfactorily completed the*

# ANGER MANAGEMENT HANDOUTS

*and is hereby awarded this certificate, this 19th day of March 2022.*

Dr. Steinhaus

Dr. Steinhaus
Staff Psychologist



# MDC Brooklyn
# Recreation Department

This is to Certify that

## JAMES BRADLEY

Has Successfully Completed

## Sentry Weight Management Journal

At MDC Brooklyn

This certificate is hereby issued this 8th day of February, 2022

R. Hallett

Recreation Specialist

